**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

               Plaintiff,

         v.

GMRI, INC.,

              Defendant.

Case No. 15-CV-20561

Honorable Judge Joan A. Lenard

**DEFENDANT'S MEMORANDUM OF LAW
IN OPPOSITION TO THE EEOC'S MOTION FOR SPOLIATION AND RULE 37(e)
SANCTIONS RELEVANT TO SUMMARY JUDGMENT AND TRIAL**

Following years of extensive and costly discovery, during which the EEOC has changed the theory of its case several times, the agency has come up empty handed.  Accordingly, its claims are the subject of a motion for summary judgment by Seasons 52.[1] (DE 241.) Rather than acknowledge the absence of any evidence of a "pattern or practice" of age discrimination at Seasons 52, or argue the facts as they have developed, the EEOC has shifted its focus to frivolous procedural motions. The EEOC's current procedural feint, its motion for spoliation sanctions (the "Motion"), is baseless. The EEOC confusingly organized its Motion to overstate the facts and issues but, at bottom, argues that Seasons 52 should have produced in discovery additional: (a) paper applications for restaurants in five cities (Tampa, FL; King of Prussia, PA; Costa Mesa, CA; Jacksonville, FL; and Kansas City, MO); (b) interview booklets and guides; and (c) emails from prior to 2014.  The EEOC has not demonstrated that such materials ever existed, that it ever asked Seasons 52 to retain such documents, that it ever requested such materials during its purported five-year investigation, or that Seasons 52 destroyed information in bad faith. Thus, the EEOC's Motion fails on several grounds.

First, the EEOC has not demonstrated that Seasons 52 had an obligation to preserve such information.  As explained below, the EEOC's argument that a four-line letter stating that the EEOC had "expanded" its investigation of unreferenced charges fails as a matter of law and common sense.  Second, the EEOC has failed to demonstrate prejudice.  Here, the EEOC's statistical expert raised no complaint that his analyses were compromised by any lack of paper applications or interview booklets, and the EEOC's complaints on its own behalf are based on speculation or misstatements of Seasons 52's arguments.  Third, the EEOC has failed to demonstrate bad faith – tampering with evidence or actions suggesting "consciousness of a weak

---

[1] Defendant GMRI is the employer of hourly employees working at Seasons 52 restaurants and would have been the employer of the allegedly aggrieved applicants referenced in the EEOC's Complaint had the applicants been hired for employment. (DE 159 at 2.) For purposes of this motion, references to "Seasons 52" should be construed to refer to the Defendant, and vice versa.

case." The EEOC cannot make any such showing because Seasons 52 has gone above and beyond its obligations and has produced tens of thousands of documents from more than 100 custodians. For these reasons, and as explained in further detail below, the Court should deny the Motion.

## RELEVANT BACKGROUND FACTS

**I.**     **The EEOC's Investigation Began With Individual Charges of Discrimination Filed By Two Unsuccessful Server Applicants At Seasons 52 In Coral Gables**

In November 2010, Seasons 52 opened a new restaurant in Coral Gables, FL. (DE 191-1, ¶ 8.)  After failing to secure Server positions at the restaurant, Anthony Scornavacca and Hugo Alfaro, filed individual charges of age discrimination.  (DE 77 ¶¶ 29, 32, 35, 40; DE 246-1 and -2.) Neither asserted class-wide allegations or theories that extended beyond their own individual circumstances. The EEOC issued notice of the charges on December 8 and 10, 2010, respectively. (DE 246-3 & -4.)  In turn, Seasons 52 issued a litigation hold to the Coral Gables Managing Partner and the employee relations manager who investigated the charge allegations.  (DE 246-11.)

In response to the Scornavacca charge and related requests by the EEOC investigator, Katherine Gonzalez, Seasons 52 submitted a position statement, produced copies of the applications submitted by those hired for hourly positions, and supplied a roster of all employees (hourly and salaried) hired by the Coral Gables restaurant.  (DE 242 ¶ 70.)  Later, Seasons 52 submitted a separate position statement in response to the Alfaro charge and made four managers responsible for interviewing applicants at the Coral Gables restaurant available for interview.  (*Id.* ¶¶ 71-72.)

**II.**    **Investigator Gonzalez Searched For Other Charges Against Seasons 52**

Sometime in August 2011, Investigator Gonzalez searched an EEOC internal system that permits users to look up cases filed against given respondents and cross reference statutes.  (DE 242 ¶ 73.)  Her search turned up a charge filed by Jerry Taylor with the EEOC in Indianapolis. (*Id.* ¶ 74.)

**III.**   **Investigator Gonzalez Revealed Her "Expanded" Investigation**

On August 31, 2011, Investigator Gonzalez sent the following short letter:

> This is notice that the EEOC is expanding the scope of the investigation of the above referenced charge of discrimination to include the hiring practices of the [sic] Seasons 52 throughout the nation as they affect a class of individuals, applicants for employment, because of their ages, under the Age Discrimination of [sic] Employment Act of 1967.
>
> Please contact the undersigned if you have any questions.

(DE 246-5.) The letter did not list any particular charge of discrimination, specify any particular position or class of positions (*e.g.*, hourly vs. salaried), describe any specific hiring practice, suggest any categories of information the EEOC might seek, or raise the prospect of future litigation. (*Id.*)

On September 1, 2011, Investigator Gonzalez sent the EEOC's first request for information about Seasons 52 locations other than Coral Gables. (DE 246-6.) The EEOC sought employment applications, interview booklets, and other documents from the locations opened during the "relevant time period" of February 1, 2010 to September 1, 2011. (*Id.*)

During its ensuing investigation, the EEOC collected applications and employee rosters, and interviewed managers, from eight locations – Coral Gables, King of Prussia, Schaumburg, Costa Mesa, North Bethesda, McLean, Indianapolis, and Phoenix.  (DE 242 ¶ 80-81.)  It collected applications and employee rosters, but did not interview managers, for three additional restaurants – Tampa, Plano, and Naples. (*Id.*)  The EEOC interviewed a manager for Oak Brook. (*Id.*)

With respect to the stores at issue in the EEOC's motion, Seasons 52 produced applications submitted by hourly candidates at Tampa and King of Prussia on November 17, 2011. (Ex. 1 (EEOC005928).) Seasons 52 produced applications submitted at the Costa Mesa location on December 5, 2011. (Ex. 2 (EEOC000583).)  The EEOC never explicitly requested applications submitted at the Jacksonville or Kansas City locations or objected to their non-production.

## IV.    The EEOC Issued Letters of Determination

On July 16, 2013, the EEOC issued Letters of Determination.  (DE 246-9 and -10.)  The Determinations did not identify any particular hiring practice as discriminatory.  (*Id.*)  Investigator Gonzalez could not recall if she recommended to Seasons 52 that it change any hiring practice or if

she told Seasons 52 who was in the "class" that the EEOC vaguely referenced, whether the class included front and back of the house employees, or hourly or salaried employees, or how many people the EEOC estimated to be in the class.  (DE 242 ¶ 82.)

In December 2013, after the EEOC had closed its investigation, an EEOC Investigator requested information for restaurants outside the 11 (Coral Gables and ten others) that the EEOC potentially had included in its investigation.  On December 2, 2013, counsel for Seasons 52 wrote to Investigator Gonzalez and stated that it was "puzzling" that the EEOC would ask for information pertaining to "all" restaurants after the EEOC had declared that it had concluded its investigation. Seasons 52 did not provide additional information.  (Ex. 7 (DARDEN 112).)  On May 23, 2014, the EEOC issued letters declaring an end to conciliation. (DE 246-10 ¶ 29.)

## V.    Seasons 52 Produced Voluminous ESI During Discovery

After negotiating with the EEOC for months regarding an Electronically Stored Information ("ESI") stipulation, Seasons 52 collected all available email and workstation documents from over 100 custodians. (Ex. 3 ¶ 2-3.) Over the subsequent months, Seasons 52 continued to investigate and collect ESI for an ever-growing list of additional custodians demanded by the EEOC.  (*Id.* ¶ 4.)  In total, Seasons 52 collected over 2,300 Gigabytes (GB) of data, totaling over 5,500,000 unique documents. Seasons 52 then applied over 1,500 negotiated, broad search terms to the collected data. (*Id.* ¶ 4.) The searches returned approximately 620,000 documents for review and cost hundreds of thousands of dollars to complete.  (*Id.* ¶ 5.)  About 31,000 ESI records, totaling in excess of 110,000 pages, were produced.  (*Id.* ¶ 6.)  The value of the emails were marginal at best, and only a small number were deemed worthy of submission to the Court in its summary judgment filings.

## ARGUMENT

## I.    THE EEOC HAS FAILED TO CARRY ITS BURDEN WITH RESPECT TO PAPER APPLICATIONS AND INTERVIEW BOOKLETS

For its spoliation arguments concerning paper applications and interview booklets, the

EEOC bears the burden of proving: (1) that the missing evidence existed at one time; (2) the alleged spoliator had a duty to preserve the evidence; and (3) that the evidence was crucial to the party's case. *Wandner v. Am. Airlines,* 79 F. Supp. 3d 1285, 1297 (S.D. Fla. 2015). The EEOC's Motion fails because it has failed to demonstrate that the paper applications and interview booklets over which it seeks an adverse inference existed at one time, were subject to a duty to preserve, were crucial to the EEOC's case, or that Seasons 52 acted in bad faith.

The EEOC also must satisfy a critical fourth element: "The Eleventh Circuit has stated that '[t]he key to unlocking a court's inherent power [to impose sanctions for spoliation] is a finding of bad faith.'" *In Matter of Complaint of Boston Boat III, L.L.C.,* 310 F.R.D. 510, 520 (S.D. Fla. 2015) (citing *Barnes v. Dalton,* 158 F.3d 1212, 1214 (11th Cir. 1998)). Thus, "even if all three elements are met, a party's failure to preserve evidence rises to the level of sanctionable spoliation in this Circuit only where the absence of that evidence is predicated on bad faith, such as where a party purposely tampers with the evidence," or where there is reason to believe that a party made evidence unavailable because of "consciousness of a weak case." *Wandner,* 79 F. Supp. 3d at 1297-1298. "Mere negligence in losing or destroying the records is not enough for an adverse inference as it does not sustain an inference of consciousness of a weak case." *Id.; see Preferred Care Partners Holding Corp. v. Humana, Inc.,* No. 08-204240-CIV, 2009 WL 982460, at *5 (S.D. Fla. Apr. 9, 2009) (declining to order adverse inference though party and counsel were "grossly negligent"). Indeed, numerous courts refuse to order adverse inferences even where there is "an indisputable destruction of evidence." *Wandner,* 79 F. Supp. 3d at 1299 (collecting cases).

The EEOC has failed to meet its burden as to applications and interview booklets.

### A.   The EEOC Has Failed To Prove That Seasons 52 Was On Notice Of A Broad Duty To Preserve Before This Lawsuit Was Filed

The EEOC cannot establish that Seasons 52 had an obligation to preserve the information that is the subject of its Motion. The lynch pin of the EEOC's argument is that an August 31, 2011

letter from Investigator Gonzalez put Seasons 52 on notice of a duty to preserve all subsequently-created documents that might relate to hiring, at all locations (whether then open or not), for all positions, for an indefinite period of time. (Motion at 4.) The argument fails on its face.

The EEOC's claim is like one rejected in *Jorud v. Michael's Store, Inc.*, No. 09-80885-CIV, 2010 WL 11504395 (S.D. Fla. June 25, 2010). The plaintiff sent an email to the defendant six months prior to filing his complaint, but the email did not suggest that litigation was imminent. *Id.* * 1. The court, therefore, concluded that the defendant had no duty to preserve evidence prior to the filing of the complaint and denied the plaintiff's motion for spoliation sanctions. *Id.*; *see also Commercial Long Trading Corp. v. Scottsdale Ins. Co.*, No. 12-22787-CIV, 2013 WL 1100063, at *8 (S.D. Fla. Mar. 15, 2013) (denying motion for spoliation sanctions where the Court could not "conclusively find that [allegedly spoliating party] knew of its full duty to preserve evidence" prior to litigation).

Here, the EEOC points to an "expansion" letter consisting of a single sentence: "This is notice that the EEOC is expanding the scope of the *investigation* of the above referenced charge of discrimination to include the hiring practices of the [sic] Seasons 52 throughout the nation as they affect a class of individuals, applicants for employment, because of their ages, under the Age Discrimination of [sic] Employment Act of 1967." (DE 246-5 (emphasis added).) The EEOC characterizes the letter as notice of an "*investigation*," not notice of *litigation*. (Motion at 4, 16.) The letter was sent by an investigator, not a lawyer, and did not identify any problems related to hiring at Seasons 52, any positions subject to an "expanded" investigation, or any "hiring practices" that might be considered. The letter also failed to instruct Seasons 52 to preserve any information.

Similarly, when Investigator Gonzalez sent a request for information the following day, she did not mention litigation or provide instruction to preserve any information. (DE 246-6.) Investigator Gonzalez sought information only for the "relevant period" of February 1, 2010 to September 1, 2011, with no suggestion that she expected Seasons 52 to retain other records,

including those it had not yet created, at locations about which she did not inquire, on a go-forward basis. (*Id.*) The remainder of the EEOC's pre-suit investigation was limited accordingly.

When Seasons 52 responded to the EEOC's request, it provided information on the restaurant locations opened during the period the EEOC had specified, including Tampa, King of Prussia, and Costa Mesa. (Ex. 4 (DARDEN 00072).) Thereafter, the EEOC's requests were similarly limited. (*See, e.g.*, DE 246-7.)[2] After sending its "expansion" letter, the EEOC obtained applications and employee rosters for just 10 locations encompassed by its Complaint. (DE 242 ¶ 80-81.)[3]

The EEOC did not state, much less suggest, that litigation was imminent, and the EEOC has not submitted evidence that anyone at Seasons 52 understood the EEOC as making such a threat. The EEOC rests its Motion on the implied notion that employers should anticipate litigation whenever they hear from the EEOC, but that is not the agency's mandate. "EEOC does not function simply as a vehicle for conducting litigation on behalf of private parties; it is a federal administrative agency charged with the responsibility of investigating claims of employment discrimination and settling disputes, if possible, in an informal, non-coercive fashion." *Occidental Life Ins. Co. of Cal. v. EEOC*, 432 U.S. 355, 368 (1977).

The EEOC points to *O'Berry v. Turner*, No. 7:15-CV-00064, 2016 WL 1700403 (M.D. Ga. April 27, 2016). In *O'Berry*, the plaintiff had been injured in an automobile accident and sued several trucking companies. Shortly after the accident, the plaintiff's attorney sent the defendant a

---

[2] The EEOC argues that "[o]n January 10, 2012, Seasons 52 acknowledged that EEOC's investigation was nationwide." (Motion at 4.) Setting aside that even the EEOC does not characterize itself as putting Seasons 52 on notice of imminent *litigation*, the statement is not correct. In the cited letter, Seasons 52 merely pointed out that the hiring data it had produced contradicted the notion of a discriminatory nationwide hiring policy. (DE 246-8.) There is no genuine dispute that the EEOC only collected applications and related materials from 11 locations during its pre-suit investigation. (DE 242 ¶ 80-81.)

[3] The Jacksonville and Kansas City restaurants opened during the EEOC's pre-suit investigation, but the EEOC never sought applications, rosters, or other information for those locations.

"spoliation letter" requesting preservation of specific documents and ESI. *Id.* at *1. The defendant acknowledged receipt of the letter and agreed to preserve the specific evidence requested. *Id.* The defendant subsequently "inadvertently destroyed" some of the evidence and the plaintiff sought sanctions. *Id.* The court found that the defendant had a clear duty to preserve as a result of the "spoliation letter." *Id.* at *3. Unlike the "spoliation letter" in *O'Berry*, the EEOC's correspondence in this case made no mention of litigation and failed to identify specific information to be preserved. The EEOC's Motion should be denied accordingly.

**B.** **The EEOC Has Failed To Carry Its Burden That The Information It Seeks Existed And Is Crucial To Its Case, Or That Seasons 52 Acted In Bad Faith**

Even if the EEOC could establish that Seasons 52 was on notice to preserve the information at issue, the EEOC still has not shown that the "missing evidence existed at one time," that it is "crucial" to the EEOC's case, or that Seasons 52 acted in bad faith.

This Court's opinion in *Wandner* is on point. In that case, the plaintiff claimed false arrest after an altercation at a County airport with an airport employee and the police. *Wandner,* 79 F. Supp. 3d at 1288. Just days after the incident, the plaintiff requested that the County preserve video tapes that might have recorded the altercation. *Id.* Communications among County employees confirmed they believed they were obligated to preserve the videos and that the County had done so in response to prior preservation requests. *Id.* at 1293. Nonetheless, the videos that the plaintiff requested were destroyed, and the Court found that there was "no doubt" that the County mishandled the preservation request. *Id.* at 1302.

Notwithstanding the acknowledged destruction of the videos, the Court refused the plaintiff's request for severe spoliation sanctions for a number of reasons. *Id.* First, the plaintiff failed to show that the videos would have shown the altercation and failed to prove that evidence was "crucial," as there was other evidence available (*i.e.*, witnesses to the altercation). *Id.* at 1303-04. Second, the plaintiff did not meet his burden of showing bad faith. *Id.* at 1303. Although the Court

found the County's conduct grossly negligent, there was no evidence that the County purposely destroyed the videos to improve its position in the litigation. *Id.*

As explained in detail below, the same principle applies here, as the EEOC cannot establish that the information it seeks did exist, that it is prejudiced by its absence, or that Seasons 52 acted in bad faith by intentionally destroying evidence to improve its position in litigation.

1.      *Paper Applications For The Tampa, King of Prussia, and Costa Mesa Locations.*

The EEOC cannot establish that Seasons 52 had, or should have had, additional paper applications for hourly positions at the Tampa, King of Prussia, and Costa Mesa restaurants. All three locations opened well before the EEOC sent its "expansion" letter, which is the earliest date even the EEOC contends that Seasons 52 could have been on notice.[4]  In response to the EEOC's request for information about locations opened between February 1, 2010, and September 1, 2011 (DE 246-6), Seasons 52 collected the available paper applications from each of these locations and produced the documents to the EEOC before the end of 2011. (DE 246-11 ¶ 13; Ex. 1-2.) Seasons 52 confirmed again with Investigator Gonzalez in early 2012 that it had produced the available paper applications. (Ex. 5 (EEOC0002713).) The EEOC cannot make a credible case for spoliation, since it has had copies of <u>all</u> of the paper applications available to Seasons 52 since well before its Complaint was filed.

The EEOC speculates that Seasons 52 must have received more applications than it produced, relying on the purported recollection of several former managers about the number of applicants interviewed.  (Motion at 6.)  This is different, of course, than the number of applications submitted, and the EEOC has not submitted any evidence that anyone destroyed applications or other materials from these locations. (DE 246-11 ¶¶ 14-15.)  The EEOC does not contend, and

---

[4] Tampa opened on February 15, 2010, King of Prussia on March 29, 2010, and Costa Mesa on August 30, 2010. (DE 191.)

cannot show, that Seasons 52 failed to collect all information available at the time of the request.

The EEOC cannot pass the red-face test with its argument that it is prejudiced by having fewer applications than it believes were submitted to these locations. After all, the EEOC claims that it conducted a pre-suit analysis of these same applications and concluded that they provided an adequate basis to file its Complaint. (DE 1 ¶ 28.)

The EEOC's only other claim of prejudice is that its statistical expert decided available applicant flow data was too light and used Census data instead. (Motion at 6-7.) The EEOC's expert did not attribute any downside to using this alternative measure, nor did he express any lack of confidence in the Census figures. (DE 246-17 ¶¶ 11, 21, 92, 101, 165-66.) Indeed, Dr. Neumark calculated statistically significant shortfalls for these locations. (*Id.*) The EEOC's chief complaint seems to be that *Seasons 52's expert*, Dr. Saad, performed analyses using Census data and reached different conclusions than Dr. Neumark. (Motion at 7.) However, this is not a spoliation argument, particularly since Dr. Saad considered Census data as a benchmark for hiring at "all restaurants," not just those where Dr. Neumark did so. (DE 246-21 ¶ 13; *see also id.* ¶¶ 15, 27, 31, 57-62.)

Finally, the EEOC cannot establish bad faith on these facts.  Relying on *Austrum v. Federal Cleaning Contractors, Inc.*, 149 F. Supp. 3d 1343 (S.D. Fla. 2016), the EEOC asserts that a finding of bad faith "is warranted here based upon [Seasons 52's] failure to comply with federal regulations" that applications be retained for one year. (Motion at 16.) Its argument is flawed because the EEOC has failed to show that Seasons 52 failed to retain applications for at least one year at these three locations, as the EEOC says its regulations require. The record reflects only that Seasons 52 collected all available paper applications in Fall 2011 and produced those documents to the EEOC shortly thereafter.  The EEOC has no evidence that some other information existed or that it was not produced because of "consciousness of a weak case." *Wandner*, 79 F. Supp. 3d at 1298.

Thus, the EEOC's Motion fails with respect to paper applications at these three locations.

2.     *Paper Applications For The Jacksonville And Kansas City Locations.*

Unlike the Tampa, King of Prussia, and Costa Mesa locations, the Jacksonville and Kansas City restaurants opened outside the time period covered by the EEOC's September 1, 2011 request for information and were not included in the EEOC's pre-suit investigation. [5] (Motion at 17-18.)

The EEOC's claim of prejudice is even weaker here.  Seasons 52 produced an enormous number of applications.  By November 2011, all Seasons 52 restaurants were using an online application tool, and there is no dispute that <u>all</u> electronic applications were retained and have been produced in this case. The EEOC's expert Dr. Neumark reports total applicants of 1,690 for Jacksonville and 1,166 for Kansas City (DE 246-17 at 70), and deemed those figures appropriate for his study. (DE 246-17 at 102-103.)

The EEOC speculates that including additional paper applications might have produced a greater shortfall in hiring numbers for those locations. (Motion at 8-9, 16.) EEOC bases its argument on the claim that another location, Coral Gables, had both paper and electronic applications, and the inclusion of paper applications there increased the alleged hiring shortfall. (*Id.*)[6] There is no obvious reason why that should hold true for every location, and the EEOC does not offer an explanation. In fact, the opposite result occurred at the Naples location, where there are statistically significant results when analyzing electronic applications but not paper applications. (DE 246-21.) It is also deeply disingenuous for the EEOC to argue about restaurant-level hiring shortfalls it might have been able to calculate if it had more paper applications. The EEOC's entire statistical argument is premised on the notion that statistics should be considered at the aggregate level, i.e., all

---

[5] Jacksonville opened on October 24, 2011, and Kansas City on November 7, 2011. (DE 191.)

[6] It is unclear whether the EEOC also alleges spoliation related to paper applications submitted to the Coral Gables location. (See Motion at 18, alleging an "unexplained failure to produce 900 Coral Gables applications.") As the EEOC acknowledges elsewhere (Motion at 9), it has had copies of those documents since the investigation, so it plainly is not prejudiced.

restaurants and positions combined. (*See* DE 253 at 10-14.) Its expert, Dr. Neumark, did not even

opine on restaurant by restaurant statistical analyses. (DE 246-17.)

The EEOC also argues that it would have identified more claimants and gathered more

anecdotal information from them had paper applications been produced. (Motion at 17.) This

argument also is purely speculative. In fact, the number of Stage One Claimants identified by

location does not appear to have any correlation to the number of applicants. For example, Naples,

with 2,627 applicants, has the greatest number of claimants (19). (Compare DE 246-7 at 70-72 to

DE 246-48.) Dallas, with a comparable number of applicants (2,346) had just four claimants. (*Id.*)

Sacramento, with nearly four times as many applicants (10,387) as Naples had fewer claimants (17).

Similarly, the EEOC complains that it found no claimants among the 1,166 Kansas City applicants,

but at the comparable sized Indianapolis restaurant (1,011 applicants) it found five claimants. (*Id.*)

Again, "[i]t is not enough that the spoliated evidence would have been relevant to a claim or

defense"; it must be "crucial" to the claim. *Wandner*, 79 F.Supp.3d at 1285. One of the cases

repeatedly cited by the EEOC, *Oil Equip. Co. Inc. v. Modern Welding Co. Inc.,* No. 16-11326, 2016 WL

5417736 (11th Cir. Sept. 29, 2016), illustrates the type of facts that support spoliation sanctions in

the Eleventh Circuit. In that case, the plaintiff had purchased an underground storage tank from the

defendant. *Id.* at *1. The plaintiff claimed that the tank was leaking because it was defective and

demanded a replacement. *Id.* at *2. The defendant thought the tank may have been installed

improperly and requested the opportunity to be present when it was removed so that it could

inspect the tank and installation site. *Id.* The plaintiff ignored the request and removed the tank

without informing the defendant. *Id.* at *3. The plaintiff then performed tests that destroyed the

tank. *Id.* The district court dismissed the plaintiffs' claims as a sanction for spoliation, and the court

of appeals approved, finding that the destruction of such crucial evidence severely prejudiced the

defendant and no cure could be applied. *Id.* at *6-7. The appellate court also found that the "record

amply supports" a finding of bad faith because the defendant had clearly put the plaintiff on notice of its intention to inspect the tank but the plaintiff removed and destroyed the tank even though it "fully appreciated the significance of the spoliated evidence to the anticipated litigation." *Id.* at *8-9.

Not surprisingly, in litigation about a defective oil tank, the tank itself was crucial evidence. The same is not true of paper applications at issue here. Seasons 52 produced thousands of applications from Jacksonville and Kansas City to the EEOC, as well as hiring data for the locations, which the EEOC's expert was able to study for purposes of his analysis. The EEOC cannot carry its burden with unsupported guesswork about how many other documents there may have been and what they may have shown.

In addition, the EEOC cannot show bad faith, as there is nothing to support the notion that records were destroyed to improve Seasons 52's litigation position. For example, as to Jacksonville, the EEOC misleadingly suggests that paper applications were destroyed after the EEOC filed its lawsuit. (DE 246 at 8.) According to former manager Amy Drafts, she was the person who shredded applications at the Jacksonville restaurant. (DE 246-45 at 3.) The EEOC presented no evidence that Drafts did so at the direction of Seasons 52, and, indeed, Drafts stopped working for Seasons 52 in December 2014 (*id.*), before the EEOC filed its Complaint in 2015. As to Kansas City, the EEOC did not take discovery and has not presented any evidence regarding the number of paper applications (if any) that might have been submitted in addition to the 1,158 electronic records that were produced. However, there is no dispute that a fire at the restaurant destroyed most paper records. (DE 246-14 at 18.) There is nothing negligent about retaining records in the restaurant, but even if there were, such would not suffice for entry of a spoliation motion "as it does not sustain an inference of consciousness of a weak case." *Wardner*, 79 F. Supp. 3d at 1297.[7] For these reasons, the

---

[7] The EEOC argues that the applications should have been collected from the sites at an earlier time. This argument ignores the EEOC's own delay in filing suit and putting Seasons 52 on notice of its

EEOC's Motion fails with respect to paper applications at these two locations.

> 3.    *Interview Booklets And Guides.*

As an initial matter, Seasons 52 collected and produced all interview booklets and guides ("Booklets") available to it. The EEOC has overstated the use of the Booklets. First, managers were not required to use the Booklets, as explained by Rule 30(b)(6) witness Laurie Casler. (Ex. 6 at 124-125 ("[T]his is a tool… each individual restaurant may have chosen to use it or not.") Second, many managers confirmed that they did not use the Booklets, used them inconsistently, or used only portions of the documents. (Ex. 8.) In light of this erratic and unpredictable use, there is no way to be sure whether the number of Booklets collected reflects the number that were used, or if some Booklets were not retained and, if so, how many.

The EEOC also grossly overstates the information that can be found in the Booklets that Seasons 52 managers did use. Its expert, Dr. Neumark, produced an Excel workbook of "coded" information from the 2,191 Booklets. (Ex. 3 ¶ 7.) For the assessment fields, the coders determined the information was "MISSING" more often than not, i.e., managers did not complete Booklet information. (*Id.*) Neither expert relied on the Booklet information. (DE 246-17, DE 246-21.)

The EEOC has offered only one argument why it is prejudiced by the production of Booklets, and it is a back-door *Daubert* argument unrelated to spoliation. Seasons 52's expert Dr. Saad performed an analysis applying the well-known "employment path" principle. (DE 246-21 ¶ 20.) As Dr. Saad explains:

> The "employment path" process starts with the premise that older workers overall are higher performing in the labor market than younger employees, because they have acquired more human capital over time, and have risen up in the labor market hierarchy and thus generally are no longer available for, or interested in, entry or mid-level work. The high performing 40+ workers who have moved up in their work lives are

---

claims. Though the EEOC issued its Determinations on July 16, 2013 (DE 246-9 and -10), it waited nearly two years before filing its Complaint (DE 1).

> unavailable for hire to Seasons 52, and are not applying to Seasons 52, thus they are no longer in the pool of entry/mid-level job applicants. The 40+ applicants who remain in the pool of applicants are those that, in spite of up to 20-30 years in the labor market, are still only qualified for (or perhaps interested in) entry or mid-level work… Put another way, if a random sample across the entire working population was to apply to Seasons 52, it is likely that 40+ applicants would be hired in greater proportions than younger workers. But the actual applicant pool to Seasons 52 is not comprised of simple random samples of under 40 and 40+ applicants.

(*Id.*)  The EEOC argues that "the analysis performed by Dr. Saad is only possible due to the spoliation," misstating the argument to suggest that he would have been required to use information about the interviews collected in Booklets had they been available. (Motion at 10.) This is patently false.  Dr. Saad never suggested that he relied on external data (the National Longitudinal Survey ("NLS")) because Booklet information was incomplete. (DE 246-21.) To the contrary, Dr. Saad testified that information in the Booklets, even if complete, did not provide a full picture of what occurred during the interviews. For example, Dr. Saad explained that "there are other things that happen in interviews that are not going to be captured by those forms; and there is no way, for example, the issue about friendliness, eye contact, all of those things, I didn't see any questions about that on the forms… [W]hile it might be complete in terms of having a form for every interviewed person, it may not be complete relative to the information that was elicited during the interviews." (DE 246-36 at 16.) He also explained that "if I had really accurate reads on performance in the interviews… it may or may not have affected both whether I used the NLS approach or how I used it." (*Id.* at 6.) In addition, Dr. Saad's employment path analysis includes concepts available through the NLS but not through applicant interview data. (*Id.*)

For these reasons, the EEOC's Motion fails with respect to interview booklets and guides.

## II.    THE EEOC HAS FAILED TO CARRY ITS BURDEN WITH RESPECT TO ESI

The EEOC's spoliation arguments relating to email, a type of ESI, are subject to Rule 37(e). The rule, which was amended in 2015, applies when ESI "that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to

preserve it, and it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). The Rule also recognizes the crucial distinction between unintentional loss of evidence and intentional destruction of evidence. Where there is an unintentional loss, and one party is prejudiced, the court "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(1). Severe sanctions, such as adverse inferences and dismissal of claims and defenses, are only ordered upon a finding that the party failed to preserve the data intentionally, and to deprive the opposing party of its use in litigation. Fed. R. Civ. P. 37(e)(2).

As the EEOC has pointed out, the Court's analysis of alleged spoliation of ESI begins with three preliminary questions, including whether the allegedly spoliated ESI:  (1) should have been preserved; (2) was lost because a party failed to take reasonable steps to preserve it; and (3) cannot be restored or replaced through additional discovery. *Living Color*, 2016 WL 1105297, at *3 (holding that spoliation sanctions were not warranted). Unless all three are answered in the affirmative, the court will not consider sanctions. *Id. See also Snider v. Danfoss, LLC*, 15 CV 4748, 2017 WL 2973464, *4 (N.D. Ill. July 12, 2017) (describing five prerequisites and holding that if any of the prerequisites are not met, "the court's analysis stops and sanctions cannot be imposed under Rule 37(e)."). The questions are not satisfied in this case, and the Motion should be denied.

A.    **The EEOC's Pre-Suit Investigation Did Not Obligate Seasons 52 To Preserve Emails At Each And Every Restaurant Opened Since February 2010**

The threshold question is whether the allegedly spoliated ESI evidence should have been preserved. *Living Color*, 2016 WL 1105297 at *4. The answer here is plainly no. "In the Eleventh Circuit, the test is whether litigation was 'pending or reasonably foreseeable' when the spoliation occurred." *Living Color*, 2016 WL 1105297 at *3. The EEOC's letter on August 31, 2011 that it was "expanding" its *investigation* was not a notice of pending *litigation*. (DE 246-5.) Further, the EEOC's primary purpose is not litigation, but to "investigate claims of employment discrimination and settle disputes, if possible, in an informal, non-coercive fashion." *Occidental Life*, 432 U.S. at 368. Indeed,

another three and a half years passed before the EEOC filed a Complaint. (DE 1.)

The EEOC's attempt to pin notice back to its "expansion" letter also begs the question: what litigation should Seasons 52 have anticipated? The letter did not say whether the EEOC intended to investigate a particular position (*e.g.*, the Server position that the charging parties had applied for), hourly or salaried employees, front or back of house employees, pre-employment testing, background checks, or any number of other subjects. A general statement of intent to investigate "hiring practices" did not hint that, years later, the EEOC would seek managers' email accounts, which were not mentioned in the letter (DE 246-5), and were never mentioned in any of the EEOC's subsequent requests for information.  (*See, e.g.*, DE 246-6 and -7.)

The EEOC suggests that *EEOC v. Fry's Elecs*, 874 F. Supp.2d 1042 (W.D. Wa. 2012), should control and that Seasons 52 should have anticipated litigation when the charge was filed.  However, the case is not analogous. In *Fry's*, the defendant had terminated plaintiff, a sales manager, and offered poor sales performance as one of the reasons for termination. The plaintiff claimed that he was terminated in retaliation for complaining about discrimination. After the plaintiff requested documents and data about his department's sales, the defendant destroyed that evidence and claimed that poor sales performance was not one of the factors in the termination decision. The court found that the defendant's conduct "was part of a systematic effort to make it difficult for plaintiffs to prove their claims and/or to destroy evidence that was adverse to defendant."

There is no similar intent here. But just as importantly, the difference in scope demands a different test. *Fry* concerned a single charging party, and his charge provided notice of his allegations and the relevant and responsive ESI. *Id.* at 1044. In contrast, there was nothing in the Scornavacca or Alfaro charges that would have led Seasons 52 to believe it must preserve all email for <u>all</u> Seasons 52 hiring managers from that point forward, including hiring managers at restaurant locations that had not even opened yet. The EEOC's "expansion" letter did not provide that notice either, nor did

its subsequent investigation, which did not even include all of the locations it now claims should have been put on an indefinite "hold." The EEOC's standard is unreasonable, and the Court should reject it in favor of the better approach suggested by *Living Color*, 2016 WL 1105297 at *4 (holding that the duty to preserve attached the same month the complaint was filed).

### B.     Seasons 52 Took Reasonable Steps To Preserve Emails

The second question is whether the allegedly spoliated ESI was lost because a party failed to take reasonable steps to preserve it. *Living Color*, 2016 WL 1105297, at *3. Again, the answer is no.

First, the EEOC is wrong when it claims Seasons 52 "took no steps to preserve e-mail at 34 of the 35 locations until after the lawsuit was filed." (Motion at 22.) In fact, the EEOC contradicts itself on the very same page. (*Id.* at n.16.) Seasons 52 switched to the ProofPoint email archiving system on February 2014, a full year before the EEOC filed its Complaint, and each and every email sent or received since that date has been preserved. (DE 246-35 at 15-16.)

Second, the EEOC cannot even say with certainty that ESI was "lost." Seasons 52 collected and produced email and other ESI from 130 custodians. (Ex. 3 ¶ 4.) Documents submitted by the EEOC show that Seasons 52 saved messages from at least 17 custodians in its Mimosa email archiving system, the predecessor to ProofPoint. (DE 246-30 and -56.) Importantly, many of the custodians routinely sent or received messages from other Seasons 52 managers, so emails for many of the managers identified by the EEOC were captured through the collections from other custodians. Collections from additional custodians would have been duplicative.

Further, even a moment's reflection reveals that the EEOC's notions of preservation are unreasonable. After the EEOC's "expansion" letter, Seasons 52 opened 25 restaurants. (DE 191.) The EEOC now, in retrospect, claims that, as it opened each location, Seasons 52 should have put each location immediately into a legal hold, to be continued indefinitely, even though the EEOC had not identified the location, requested information about it, articulated what it was investigating

(other than vague "hiring practices"), or extended its investigation to those locations. Seasons 52 had no notice or reason to believe that it was subject to any such obligation.

### C.     The ESI Can Be Restored Or Replaced Through Additional Discovery

The final question is whether the allegedly spoliated ESI can be restored or replaced through additional discovery. *Living Color*, 2016 WL 1105297 at *5. Here, it effectively can.

As noted above, for ESI after February 2014, there is nothing to be replaced, because those emails were preserved and produced. As to earlier ESI, it is important to bear in mind that the EEOC is not seeking any *particular* email. Rather, it wants to hunt through the emails in the hope that it will turn up some as yet unknown piece of anecdotal evidence.[8] Seasons 52 collected and produced email and other ESI from 130 custodians, turning over tens of thousands of documents extending to more than 110,000 pages. (Ex. 3 ¶ 3-6.) Since many of the custodians routinely sent or received messages from other Seasons 52 managers, emails for many of the managers were captured through the collections from other custodians.

### D.     The EEOC's Requested Sanctions Exceed What The Rules Permit

For the reasons explained above, the EEOC is not entitled to any sanctions at all.  In addition, the three sanctions requested by the EEOC exceed what are permitted under the Rules.[9]

The first requested sanction and part of the second are two sides of the same coin.  The

---

[8] The EEOC claims that additional email may have revealed "top down" instructions to discriminate in hiring. (Motion at 13.) The examples that it claims to have found are not "top down" messages at all. For example, one of the messages described is from a *training* manager who had no hiring authority at all, and there is no suggestion that anyone read, much less acted in response to, his email. (*Id.*) More importantly for purposes of this Motion, Seasons 52 collected and produced ESI from many actual "top down" messengers, including the former and current Presidents of Seasons 52, two Vice Presidents, an Executive Chef, multiple Directors of Operations, and others. (Ex. 3 ¶ 4.) The restaurant managers who are the subject of the EEOC's Motion have local responsibilities and are not in a position to send "top down" messages of discrimination.

[9] In this respect, it is different from other cases cited by the EEOC.  For example, *Muhammad v. Mathena*, No. 7:14CV00529, 2016 WL 8116155 (W.D. Va. Dec. 12, 2016), concerns a videotape of a fight, and the parties to that fight at least might plausibly have some knowledge of the video content.

EEOC requests that Seasons 52 be prohibited from "introduc[ing] evidence about the content of lost emails" and that the EEOC be permitted "to argue what the lost emails likely would have contained." (Motion at 24.) Here neither party has knowledge about the content of emails that were not produced, so testimony by either side would be speculative.[10]

The EEOC's third requested sanction asks that the Court "institute a permissive inference… that had e-mail been preserved, the e-mail would reflected additional emails expressing a preference for younger applicants." (Motion at 24.) (The EEOC's second request, described above, is similar since the EEOC would certainly argue the content would have favored the EEOC and disfavored Seasons 52.) However, presumptions that evidence is unfavorable are appropriate "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). There is no basis for such a finding in this case. Thus, any sanction to be imposed must fall under Rule 37(e)(1), which limits the Court to "order measures *no greater than necessary* to cure the prejudice." Fed. R. Civ. P. 37(e)(1).

## CONCLUSION

For these reasons, Defendant respectfully requests that the Court deny the EEOC's Motion.

---

[10] *Muhammad*, 2016 WL 8116155, cited by the EEOC (Motion at 24), is not analogous. In that case, where a prison did not preserve video that might have shown a fight involving the plaintiff, an inmate, the court found "a moderate level of prejudice" because juries often consider prisoners less credible. *Id.* at *9. The court rejected the plaintiff's request for an adverse inference instruction. *Id.* Instead, the court ordered "limited measures," such as prohibiting the defendant from introducing evidence about the plaintiff's conviction and disciplinary charges. *Id.*

**DATED: August 16, 2017**          Respectfully submitted,


By: /s/ Gerald L. Maatman, Jr.
_____

Gerald L. Maatman, Jr. (*gmaatman@seyfarth.com*)
Jennifer A. Riley (*jriley@seyfarth.com*)
Andrew Scroggins (*ascroggins@seyfarth.com*)
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606
Telephone: (312) 460-5000
Facsimile: (312) 460-7000

Alex Drummond (*adrummond@seyfarth.com*)
SEYFARTH SHAW LLP
1075 Peachtree Street, NE, Suite 2500
Atlanta, GA 30309
Telephone: (404) 885-1500
Facsimile: (404) 885-7056

Michael C. Marsh (*michael.marsh@akerman.com*)
AKERMAN LLP
One Southeast Third Avenue, 25th Floor
Miami, FL 33131
Telephone: (305) 982-5507
Facsimile: (305) 374-5095

Arlene K. Kline (*arlene.kline@akerman.com*)
AKERMAN LLP
777 South Flagler Drive
Suite 1100 West Tower
West Palm Beach, FL 33401-6183
Telephone: (561) 653-5000
Facsimile: (561) 659-6313

*Attorneys For Defendant*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that, on this 16th day of August 2017, he caused

the foregoing to be filed with the Clerk of the Court using the CM/ECF System, which will send

notification of such filing to all counsel of record, including the following:

**Beatriz Biscardi Andre**
**Kristen M. Foslid**
**Ana Consuelo Martinez**
**Kimberly Ann McCoy**
**Daniel Seltzer**
**Robert Elliot Weisberg**
U.S. Equal Employment Opportunity
Commission
The Miami Tower
100 SE 2nd Street, Suite 1500
Miami, FL 33131
305-808-1779
ana.martinez@eeoc.gov
daniel.seltzer@eeoc.gov
kimberly.Cruz@eeoc.gov
kristen.foslid@eeoc.gov
beatriz.andre@eeoc.gov

/s/ Andrew Scroggins