# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

### CASE NO. 15-20561-CIV-LENARD/GOODMAN

UNITED STATES EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

      Plaintiff,

v.

GMRI, INC.,

      Defendant.

_____/

## ORDER ON EEOC'S MOTION FOR SPOLIATION AND RULE 37(E) SANCTIONS

John Hiatt, a critically-acclaimed rock guitarist, pianist, singer, and songwriter whose songs have been covered by B.B. King, Bob Dylan, Bonnie Raitt, Buddy Guy, Eric Clapton, Keith Urban, and Three Dog Night (to name but a few of many performers from myriad musical genres), wrote a song released in 1995 called "Shredding the Document." Hiatt's chorus in that song is: "I'm shredding the document / I'm keeping my mouth shut."[1] The notion that someone shredded, destroyed, or discarded documents (or, to use other phrases from Hiatt's song, "doctored the evidence" in order to pursue "a cover up") is at the heart of the sanctions motion being considered here.

---

[1]     JOHN HIATT, *Shredding the Document, on* WALK ON (Capitol Records 1995).

Analyzing the sanctions motion begins with the observation that Defendant GMRI, Inc. (a/k/a "Seasons 52" in this Order) filed a summary judgment motion against Plaintiff [ECF No. 241], the United States Equal Employment Opportunity Commission (the "EEOC"). In it, Seasons 52 argues that the EEOC "has come up empty handed" in its effort to establish that Seasons 52 restaurants engaged in a nationwide pattern and practice of intentional age discrimination against applicants age 40 and older.

After Seasons 52 filed its summary judgment motion, the EEOC filed a Motion for Spoliation and Rule 37(c) Sanctions. [ECF No. 246]. Seasons 52 filed a response in opposition to the sanctions motion [ECF No. 259], and the EEOC filed a reply [ECF No. 260].

In its sanctions motion, the EEOC alleges that Seasons 52 failed to preserve and intentionally destroyed paper applications and interview booklets. It also alleges that Seasons 52 failed to take any steps to preserve emails sent by or to the restaurant managers involved in the very hiring decisions challenged in the EEOC's lawsuit.

The sanctions motion seeks myriad types of spoliation sanctions, including an Order (1) prohibiting Seasons 52 from introducing evidence about the content of lost emails; (2) permitting the EEOC to introduce evidence of the email destruction; (3) allowing the EEOC to argue to the jury that the lost emails would have contained information supporting its claim; (4) authorizing the Court to consider the lost email arguments for summary judgment purposes; and (5) permitting a permissive inference,

both at the summary judgment stage and at trial, that the emails, had they been preserved, would mention a Seasons 52 preference for younger applicants.

United States District Judge Joan A. Lenard referred the sanctions motion to the Undersigned. [ECF No. 256]. The Undersigned directed the parties to submit additional memoranda [ECF No. 261], and they did so [ECF Nos. 274; 275]. In addition, the Undersigned held an evidentiary hearing on October 11, 2017 [ECF No. 297] and entertained oral argument. Six witnesses testified at the initial evidentiary hearing.

The Undersigned later scheduled a supplemental evidentiary hearing [ECF No. 298], which took place on October 19, 2017. [ECF No. 312]. Two witnesses testified at the follow-up hearing. The sanctions motion is a well-briefed one and is ripe.

In its opposition, Seasons 52 implies that the sanctions motion is a direct response to its defense summary judgment motion. It implicitly suggests that the EEOC was alarmed about the defense summary judgment motion and is using the sanctions motion as a frantic, last-minute legal life-preserver to rescue it from a scenario where it has "changed the theory of its case several times" and yet ended "empty handed."

The Undersigned rejects the unstated but not-too-subtle argument that the sanctions motion is a direct response to the summary judgment motion. Seasons 52's summary judgment motion was filed on July 31st and the EEOC's sanctions motion was filed shortly thereafter, on August 2nd. The sanctions motion (and its incorporated legal memorandum) is 23-pages long and references 58 exhibits, all of which are attached to

the motion. So it is highly likely that the EEOC began preparing the sanctions motion long **before** it received Seasons 52's summary judgment motion. Thus, the Undersigned will assess the sanctions motion and the opposition without accepting the tacit argument that the sanctions request is an eleventh-hour smokescreen set up to deflect the Court's attention from a purportedly weak case (which, according to Seasons 52, was revealed in its summary judgment motion).

In any event, for the reasons outlined below, but without accepting Seasons 52's inferred theory that the timing of the sanctions motion is somehow evidence that the EEOC recognizes the purported weaknesses in its case, the Undersigned **denies in part** and **grants in part** the motion.

This Order does not now provide the most-severe type of relief sought -- permissible inferences at the summary judgment and trial stages. But it does provide some relief to the EEOC -- i.e., it may present evidence of the purportedly destroyed and/or missing paper applications, interview booklets and guides, and emails to the jury. Moreover, it provides other limited, potential relief: it permits the EEOC to rely on that evidence and argue to the jury that Seasons 52 acted in bad faith (as defined by Rule 37(e)(2)) and that, if the jury were to agree with that EEOC theory, then it may infer from the loss of electronically stored information ("ESI") that it was unfavorable to Seasons 52.

In addition, the Undersigned **rejects** Seasons 52's position that it was not under a

duty to preserve documents and ESI for any location other than one restaurant in Coral Gables, Florida. Nevertheless, the Undersigned will not now be authorizing the permissible inference type of sanction because the EEOC has not sufficiently established two of the required factors: (1) under applicable Eleventh Circuit law, that (for the paper applications and interview booklets) the supposedly missing evidence is *crucial* to the movant's case, and (2) that (for the email evidence, which is governed by Rule 37(e)(2)) Seasons 52 acted "to deprive [the EEOC] of the information's use in the litigation."

The Eleventh Circuit's common law of spoliation concerns the paper applications and interview booklets; Rule 37(e)(2) governs the email evidence (because it is electronically stored information).

The parties will both be permitted to introduce to the jury at trial evidence of missing documents and ESI and the **circumstances** surrounding the destruction or absence of records. The parties may also make arguments about the destruction (or non-destruction) of paper applications and booklets and ESI, as well as the possible motives for their alleged destruction. And they will be able to present competing themes about the significance or insignificance of the missing and/or destroyed material (or if they are actually missing in the first place).

In addition, the parties' ability to present evidence and argument about the *circumstances* would permit the EEOC to present (through evidence and closing

argument) its view that the investigation's scope was national and that Seasons 52's interpretation (i.e., that the actual scope of the litigation remained only with the one Coral Gables restaurant) was incorrect and unreasonable. Likewise, this Order would permit Seasons 52 to present evidence and argument about *its* interpretation of the investigation's scope and why it deems its view and conduct to be reasonable.

And, concerning the **email** evidence, the EEOC will be permitted (under Rule 37 (e)(2)) to seek a permissible inference (but it must persuade a jury that Seasons 52 acted in bad faith -- i.e., that it "acted with the intent to deprive" the EEOC of the email evidence's "use in the litigation."

I.      **Factual and Procedural Background**

Much of the factual background is undisputed, as it is reflected in letters and emails. But there is a significant factual dispute about whether, before the lawsuit was filed, Seasons 52 ever learned that the EEOC's investigation was national in scope and, if so, when and under what circumstances it gained that knowledge. This knowledge question is important because the EEOC must establish that Seasons 52 was under a duty to preserve documents and ESI when the material was lost or destroyed in order to obtain the harsher sanctions it seeks.

Seasons 52 contends that it was under a duty to preserve for only one restaurant in Coral Gables because the two complaints that triggered the EEOC investigation concerned that sole location. The EEOC, however, contends that Seasons 52 had a duty

to preserve for **all** restaurants in the country because the scope of the investigation expanded into a national investigation encompassing all Seasons 52 restaurants. Central to that argument is an August 31, 2011 letter from the EEOC to Seasons 52 that purported to expand the investigation into a national one -- which the parties call the "expansion letter."

Seasons 52 did not initially argue that it never received the expansion letter. Instead, its August 16, 2017 response to the sanctions motion advanced *other* arguments. But at the October 11, 2017 evidentiary hearing, Seasons 52 contended for the first time that it never received the expansion letter, and it uses this non-receipt as a major reason for its conclusion that it was not on notice of a national investigation (and therefore had no duty to preserve information other than for the Coral Gables restaurant). This Order will discuss that letter (and myriad other exhibits).

The Undersigned's ultimate conclusion is that Seasons 52 **was** under a duty to preserve documents and ESI for 11 restaurants. This conclusion does not adopt the theory advanced by either party. Instead, it is based on my assessment that although the EEOC has not established that Seasons 52 ever received the August 31, 2011 expansion letter (which mentions an investigation "throughout the nation"), Seasons 52 knew or should have known of its obligation to implement a litigation hold for documents concerning 11 restaurants. That is because Seasons 52 does not dispute receiving a letter from the EEOC dated September 1, 2011 -- just one day after the expansion letter --

which expressly requested a large amount of information and documents from many restaurants "**due to an expansion of the case**."

## A. The EEOC's Pre-Hearing Version of the Facts

The EEOC's version of the relevant factual background is outlined in its motion, which the Court excerpts here (minus many of the footnotes and minus some of the argument and rhetoric and with some modest clarifications, as needed).

### i. Seasons 52 Was (Purportedly) on Notice of the EEOC's Nationwide Investigation.

Anthony Scornavacca and Hugo Alfaro filed charges of discrimination against Seasons 52 (Coral Gables) under the Age Discrimination in Employment Act in October and December 2010, respectively. [ECF Nos. 246-1; 246-2]. The EEOC notified Seasons 52 of the charges and explained the EEOC's recordkeeping regulations. [ECF Nos. 246-3; 246-4].

On August 31, 2011, the EEOC issued the expansion letter[2] and notified Seasons 52 that it was expanding the investigation to include Seasons 52's hiring practices *throughout the nation* as they affect a class of individuals, applicants for employment, because of their ages. [ECF No. 246-5]. The following two days, in a separate letter and email, the EEOC requested nationwide information that included, among other things, an employment roster for all Seasons 52 locations [ECF No. 246-6], as well as

---

[2]     As explained above, however, Seasons 52 now contends that it never received this letter.

applications and interview booklets for 10 locations. [ECF No. 246-7].

On January 10, 2012, Seasons 52 apparently acknowledged in a letter that the EEOC's investigation was nationwide. [ECF No. 246-8]. This letter is to the lead EEOC Investigator, Katherine Gonzalez, and was written by a Seasons 52 in-house paralegal named Deborah Dubinsky, who described herself as a "senior paralegal – Employment Law." [ECF No. 246-8]. In this letter, Dubinsky noted that she was attaching a roster of employees from the Seasons 52 Naples, Florida restaurant. She then pointed out that the records demonstrate that "16.4% of employees at this restaurant are over the age of 40." [ECF No. 246-8]. According to Dubinsky's letter, this, along with other rosters previously provided, "refutes the allegation that Seasons 52 maintains a nationwide hiring policy that discriminates against individuals over the age of 40." [ECF No. 246-8]. Thus, it is this paralegal letter which the EEOC contends supports its position that "Seasons 52 acknowledged that [the] EEOC's investigation was nationwide." [ECF No. 246, p. 5].

On July 16, 2013, the EEOC issued Letters of Determination finding that Seasons 52 "engaged in a pattern or practice of not hiring individuals who are over the age of forty at its Seasons 52 restaurants throughout the United States." [ECF No. 246-9, p. 2]. During conciliation,[3] the EEOC advised Seasons 52 that it was conciliating on

---

[3]    As the EEOC explains to the public, conciliation is an informal and confidential process in which the parties who participate must agree to the resolution. The Letter of Determination invites the parties to join the EEOC in seeking to settle the charge

behalf of a nationwide class of applicants. [ECF No. 246-10, p. 2].[4]

The EEOC filed its Complaint on February 12, 2015. [ECF No. 1].

### ii. Seasons 52's Document-Retention Policies Require Preservation.

Seasons 52's document-retention policies in effect since 2010 require the preservation of all applications and interview booklets for non-hired applicants for at least three years and, for hired applicants, for a minimum of six years. [ECF No. 246-11, ¶¶ 8–9]. Business related email is also subject to retention. [ECF No. 246-11, ¶ 11].

Further, according to the policy, if there is an investigation, then "an in-house [Seasons 52] attorney will issue a notice of Record Hold to inform Employees of the Records that must be retained until the issue is resolved." [ECF Nos. 246-12, p. 5; 246-13, p. 2]. Information technology ("IT") professionals are then tasked to "collect[] all emails available in the custodian's email box on the day the hold is sent out and continue[] to save all emails (sent and received) until the hold is released." [ECF No. 246-12, p. 5].

---

through conciliation. The EEOC is required by Title VII to attempt to resolve findings of discrimination on charges through conciliation. If conciliation fails (as it did here), then the EEOC decides whether to sue the employer. *What You Should Know: The EEOC, Conciliation, and Litigation*, EEOC.GOV, https://www.eeoc.gov/eeoc/newsroom /wysk/conciliation_litigation.cfm (last visited October 24, 2017).

[4] Investigator Gonzalez's declaration refers to a February 4, 2014 letter about conciliation in which the EEOC "advised Defendant that it was seeking relief for a nationwide class that covered all restaurants opened from February 10, 2010 to the present."

### iii. Seasons 52 (Supposedly) Failed to Issue an Appropriate Litigation Hold.

When Seasons 52 initially received the charges of discrimination, it issued litigation holds dated December 16, 2010, to Gary Marcoe, Managing Partner in Coral Gables, and Christine Wilson, the Director of Employee Relations. [ECF No. 246-11, ¶ 21]. Thereafter, Seasons did not issue litigation holds for other locations until at least May 27, 2015 [ECF Nos. 246-11, ¶ 20; 246-14, pp. 48:18–49:2, 60:5-61:3, 76:15–25], which was three years and eight months after the expansion letter [ECF No. 246-5] and three months after the EEOC's lawsuit was filed. [ECF No. 1].

### iv. Paper Applications: Tampa, King of Prussia ("KOP"), and Costa Mesa.

Seasons 52 received paper applications at the Tampa, KOP, and Costa Mesa restaurants. [ECF No. 246-17, p. 70]. In 2011, Seasons 52's "litigation team" collected materials from these locations by asking managers to send them to a central office to be scanned. [ECF No. 246-14, pp. 30:14–21, 52:5–11, 57:25–58:20]. No one issued a litigation hold or went to the restaurants to oversee the collection (except perhaps at Coral Gables). [ECF No. 246-14, p. 58:7–20]. Seasons 52 failed to produce a large number of applications to the EEOC for those three locations:

| Tampa | 1800 applications received per Manager testimony | 205 produced |
| KOP | 1000 applications received per Manager testimony | 325 produced |
| Costa Mesa | 1000 applications received per Manager testimony | 322 produced |

Because these stores' limited application data production is not representative, the EEOC's statistical analysis for Tampa, KOP, and Costa Mesa is by necessity based on proxy Census data. [ECF No. 246-17, p. 38]. As Dr. Ali Saad's (Seasons 52's expert) analysis demonstrates, the EEOC contends that this prejudices its position because Census data reflects less under-hiring of older applicants than actual applicant data at each of the remaining eight locations that accepted paper applications. [*See generally* ECF No. 246-21]. Specifically, using application data, Dr. Saad found a statistically significant failure to hire older workers for seven of eight locations and under-hiring of older workers at the eighth location. [ECF No. 246-21, p. 81]. But using Census data, Saad reported statistical significance at only two of the same eight locations, with two restaurants slightly *over-hiring* older applicants. [ECF No. 246-21, p. 142]. Thus, the EEOC contends that the forced use of Census data understates Seasons 52's discriminatory hiring at these three locations and thus negatively impacts the relief it can recover for victims of discrimination.

v.  **Seasons 52 Says that it Has No Knowledge.**

Accordingly to the EEOC, Seasons 52 claims that it has no "knowledge of the destruction of applications, interview booklets or other related documents from . . . Tampa, King of Prussia, [and] Costa Mesa." [ECF No. 246-11, ¶ 15]. Seasons 52 also represents that it is "unaware" of the number of applications the restaurants received, notwithstanding the testimony of its managers. [ECF No. 246-14, pp. 47:14–18, 56:21–

57:5, 58:21–24, 59:13–60:3].[5] Seasons 52 further claims to be unaware of data being lost at any time. [ECF No. 246-14, pp. 41:14–24, 46:7–15, 52:12–14, 59:9–12].

> vi.     Paper Applications: Jacksonville and Kansas City.

The EEOC also maintains that Seasons 52 destroyed a significant number of paper applications from Jacksonville and Kansas City:

| Location | Min. # Paper Apps Received | Paper Apps Produced by Seasons 52 |
|---|---|---|
| Jacksonville | 1,000 [ECF No. 246-45, p. 56:20-24] | 126 |
| Kansas City | unknown | 8 |

Moreover, it argues that Seasons 52's preservation efforts were particularly tardy and lackadaisical. Although the EEOC set discovery hearings [ECF Nos. 49; 80] and repeatedly requested a timeline for the production of paper applications [ECF No. 246-29, pp. 1, 3], Seasons 52 made no effort to collect paper documents for these 2 locations (Jacksonville and Kansas City), or other locations, until January 2016, 11 months *after* the EEOC filed this lawsuit. [ECF Nos. 246-11, ¶ 17; 246-14, pp. 67:16–68:16, 76:24–25].

All the while, Seasons 52 represented to the EEOC that efforts to collect paper data were underway. [ECF No. 246-29, p. 6 ("Our [Seasons 52's] first priority has been the collection and review of applications and related documents.")]. According to the EEOC, this delay indicates that Seasons 52 waited too long.

---

[5]     Seasons 52 explains that the managers' deposition answers are imprecise guesstimates given years after the fact and only because responses were needed to questions asked by an EEOC attorney at the depositions.

In Jacksonville, managers testified that paper applications and booklets were shredded. [ECF Nos. 246-45, pp. 56:20–60:13, 79:1–6; 246-49, pp. 113:24-117:16]. Yet Seasons 52 asserts that it has "no knowledge" of any destruction of documents from Jacksonville. [ECF No. 246-14, pp. 72:25–73:16]. As to Kansas City, a December 31, 2015 fire -- 10 months after the EEOC's Complaint was filed -- destroyed the application materials. [ECF No. 246-14, pp. 64:22–65:16, 67:3–20].

Thus, because Seasons 52 failed to produce virtually all of the paper applications, the EEOC analyzed only electronic data at these two restaurants. To illustrate the significance of this, the EEOC points to the scenario at the Coral Gables restaurant.

In Coral Gables, while the electronic data (392 electronic applicants) suggests that older workers were *favored* [ECF No. 246-21, p. 72], the paper data tells a different story. During litigation, Seasons 52 produced 256 paper applications from Coral Gables. [ECF No. 246-26, ¶ 14]. Seasons 52, however, had produced approximately 900 more Coral Gables applications during the EEOC's investigation -- applications that it failed to produce in litigation. With the complete paper data (1179 applications), Dr. Saad acknowledges that Coral Gables shows a statistically significant failure to hire older applicants. [ECF No. 246-21, p. 81].

> **vii.**       **Seasons 52 Failed to Produce Interview Booklets.**

During 2010 and 2011, Seasons 52 gave restaurants a standard interview booklet in order to, among other things, provide an interview scoring system for evaluating

applicants. [ECF No. 246-27]. When stores switched to electronic applications, Seasons 52 switched to using an interview guide, which closely resembled the booklet and served the same general purposes. [ECF No. 246-28]. In total, Seasons 52 produced approximately 2,202 booklets and 786 guides from 32 of 35 restaurants. [ECF No. 246-26, ¶ 16]. Of the booklets produced, Dr. Saad confirmed that they were heavily skewed towards hires. [ECF No. 246-36, p. 58:18–23]. The EEOC argues that this indicates that Seasons 52 destroyed thousands of booklets for unsuccessful applicants.

Hiring managers testified that booklets and guides were required, or generally used, in Tampa, KOP, Plano, Phoenix, Indianapolis, North Bethesda, McLean, Naples, Jacksonville, Memphis, and Columbia, but even from these locations, the EEOC received significantly less booklets and guides than the number of applications. In fact, there is evidence that, after the EEOC's expansion letter,[6] some of these booklets and guides were intentionally destroyed. [ECF Nos. 246-46, p. 76:2–5 (after interview, guides thrown away at Memphis); 246-49, pp. 113:24–117:17 (policy to shred at each location where Carmen Net is Director of Operations and applications/booklets kept together); 246-31, p. 8 (Net is DO over Jacksonville, Memphis, Birmingham, Sarasota, Tampa); 246-50, p. 64:4–22 (immediate shredding of booklets at Cherry Hill); 246-32, pp. 245:6–247:12 (TAS paperwork and prescreen notes destroyed in Chicago).

The EEOC argues that the absence of Seasons 52's booklets and guides is highly

_____

[6] This refers to the August 31, 2011 letter which Seasons 52 now says it never received.

prejudicial to the EEOC because it adversely affects the analysis Dr. Saad performed. Dr. Saad's expert report repeatedly states that there is no information regarding what transpired during the interview. [ECF No. 246-21, ¶¶ 10, 11, 26, 93]. Seizing upon this void in the data, Dr. Saad argues that older workers seeking entry-level and mid-level restaurant service jobs possess, on average, less ability than younger workers seeking the same jobs, and that this was evident in the interview performance of older workers. [ECF Nos. 246-21, ¶ 11, 79; 246-36, pp. 137:8–139:7, 144:12–17]. He then turns to the National Longitudinal Study of Youth, an external data source, to discount the value of applications from older applicants by an amount up to 0.36, which Dr. Saad says is the measure of older applicants' lesser ability that would have been evident at interviews. [ECF Nos. 246-21, App. A, ¶¶ 96–101; 246-36, pp. 177:24-181:4]. Dr. Saad supposes that the longer unemployment duration of older workers is proxy for the abilities possessed by applicants to Seasons 52. [ECF Nos. 246-21, ¶¶ 20–21, 97; 246-36, pp. 148:15-22, 173:6-15, 174:17-175:2]. Dr. Saad acknowledges that if scores from booklets and guides were available, then he would have had to consider them. [ECF No. 246-36, pp. 61:11–65:7].

> **viii.**      **Seasons 52 Failed to Preserve and Produce Relevant Emails.**

For each of the 35 restaurants at issue in this lawsuit, Seasons 52 issued two email accounts: one for the restaurant itself ("Restaurant Email") and one for the Managing Partner ("MP Email"). [ECF No. 246-35, p. 19:14–16, 19:20–24]. These email accounts were used for internal and external communications about, among other things, hiring,

recruiting, and specific applicants.

From February 2010 until February 2014, emails were preserved for 90 days on Seasons 52's NearPoint Mimosa archiving system and then automatically deleted. [ECF Nos. 246-14, p. 22:19-21; 246-35, pp. 10–11]. Emails were preserved beyond that 90-day period only if a litigation hold was issued. [ECF No. 246-35, pp. at 10–11]. In February 2014, Seasons 52 switched to a ProofPoint archiving system that featured an automatic three-year preservation for all emails. [ECF No. 246-35, pp. 14–18].

Seasons 52 issued two relevant litigation holds: one for Coral Gables in 2010 and a second in May 2015 for all 35 restaurants. [ECF No. 246-35, pp. 21–27]. The EEOC contends that Seasons 52 made no other efforts to preserve emails.[7] The EEOC also notes that it appears as though Seasons 52 did not even take the basic step of preserving any hard drives. [ECF No. 246-35, p. 47].

In discovery, the EEOC requested emails for all 35 restaurants from when the restaurant began hiring through one year of the new restaurant openings ("NRO"). The degree of alleged spoliated email varies depending upon the location's opening date in

---

[7] At the evidentiary hearing, Seasons 52 introduced testimony explaining that it did, in fact, take steps to *preserve* emails even though a **formal** litigation hold was not imposed. At bottom, Seasons 52 concedes that no official, formal litigation holds were issued other than the two described above, but contends that it was not required to initiate additional litigation holds and, even if it had been required, the failure to do so is ultimately inconsequential because it preserved the materials anyway. This Order will discuss this position under the section describing the relevant testimony from the evidentiary hearings.

relationship to the date of the expansion letter (which -- if received -- would begin Seasons 52's duty to preserve) and when Seasons 52 began archiving email in ProofPoint (February 2014):

• Plano, Phoenix, Indianapolis, North Bethesda, and McClean opened *before* the expansion letter. According to the EEOC, had Seasons 52 issued a litigation hold upon receipt of the expansion letter, it would have preserved at least some emails exchanged during the first year of the NRO. (Of course, this position assumes that Seasons 52 received the so-called expansion letter, which it says it did not.)

• Jacksonville, Kansas City, Garden City, Oak Brook, Dallas, and Los Angeles lost *all* email from pre-NRO through one year after restaurant opening.

• Naples lost all Restaurant Email; Managing Partner Dunavan's email goes back to 2012.

• Norwood, Santa Monica, Birmingham, Burlington, Houston, Chicago, Chestnut Hill, San Diego, and Houston opened in 2013, after the expansion letter.[8] The EEOC has some emails during the one year period, but no emails from the NRO hiring time frame.

• Edison and Memphis opened in January 2014, after the expansion letter and immediately before Seasons 52 switched email systems. At these locations, the EEOC has some emails from the Managing Partner/Restaurant, but not from the pre-opening,

---

[8] Given the number of times that the EEOC's factual summary mentions the "expansion letter," it is obvious that the letter's receipt or non-receipt is a critical fact.

NRO hiring time frame.

**B.**     *Season 52's Pre-Hearing Version of the Facts*

Seasons 52's factual position is outlined in its response in opposition to the sanctions motion. The Undersigned excerpts the summary with the same modifications and caveats I used for the EEOC's factual summary. Many of the Seasons 52-asserted facts are similar to those listed in the EEOC version, but they are worded slightly differently. For some facts, Seasons 52 portrays them in a significantly different light. That is understandable. The EEOC's version highlights certain facts and describes them in a plaintiff-friendly way, and Seasons 52 emphasizes other facts and cases them in a defendant-oriented way.

In addition, the Undersigned notes that Seasons 52's factual summary discusses Investigator Gonzalez's August 31, 2011 letter (the so-called "expansion letter") *as though it had been timely received.* Its pre-hearing memoranda never asserted the argument that it never received the letter. Seasons 52 later (at the evidentiary hearing) took the position that it never received this letter (and it points to several unusual factors surrounding the document to bolster its new we-never-received-the-letter position).

**i.     The EEOC's Investigation Began with Two Individual Charges of Discrimination Filed by Unsuccessful Server Applicants at Seasons 52 in Coral Gables.**

In November 2010, Seasons 52 opened a new restaurant in Coral Gables, Florida.

[ECF No. 191-1, ¶ 1]. After failing to secure Server positions at the restaurant, Scornavacca and Alfaro filed individual charges of age discrimination. [ECF Nos. 77, ¶¶ 29, 32, 35, 40; 246-1; 246-2]. Neither asserted class-wide allegations or theories that extended beyond their own individual circumstances. The EEOC issued notice of the charges on December 8, 2010 and December 10, 2010, respectively. [ECF Nos. 246-3; 246-4]. In turn, Seasons 52 issued a litigation hold to the Coral Gables Managing Partner and the employee relations manager who investigated the charge allegations. [ECF No. 246-11].

In response to the Scornavacca charge and related requests by investigator Gonzalez, Seasons 52 submitted a position statement, produced copies of the applications submitted by those hired for hourly positions, and supplied a roster of all employees (hourly and salaried) hired by the Coral Gables restaurant. [ECF No. 242, ¶ 70]. Later, Seasons 52 submitted a separate position statement in response to the Alfaro charge and made four managers responsible for interviewing applicants at the Coral Gables restaurant available for interview. [ECF No. 242, ¶¶ 71–72].

### ii.      Investigator Gonzalez Searched For Other Charges Against Seasons 52

Sometime in August 2011, Investigator Gonzalez searched an EEOC internal system that permits users to look up cases filed against given respondents and cross reference statutes. [ECF No. 242, ¶ 73]. Her search turned up a charge filed by Jerry Taylor with the EEOC in Indianapolis. [ECF No. 242, ¶ 74].

### iii.        Investigator Gonzalez Revealed Her "Expanded" Investigation

On August 31, 2011, Investigator Gonzalez sent the following short letter:

> This is notice that the EEOC is **expanding the scope of the investigation** of the above referenced charge of discrimination to include the hiring practices of the [sic] Seasons 52 **throughout the nation** as they affect a class of individuals, applicants for employment, because of their ages, under the Age Discrimination of [sic] Employment Act of 1967.

[ECF No. 246-5 (emphasis added)]. The letter did not list any particular charge, specify any particular position or class of positions (e.g., hourly vs. salaried), describe any specific hiring practice, suggest any categories of information that the EEOC might seek, or raise the prospect of future litigation. *Id.*[9]

On September 1, 2011, Investigator Gonzalez sent the EEOC's first request for information about Seasons 52 locations other than Coral Gables. [ECF No. 246-6]. The EEOC sought employment applications, interview booklets, and other documents from the locations opened during the "relevant time period" of February 1, 2010 to September 1, 2011. *Id.*

Concerning the restaurants at issue in the EEOC's motion, Seasons 52 produced applications submitted by hourly candidates at Tampa and KOP on November 17, 2011.

---

[9]        Seasons 52's phrasing does not suggest that it was in any way challenging the receipt of the letter. Instead, it highlighted the fact that the letter was short and did not mention certain topics. The wording suggests, at least implicitly, that Seasons 52 *acknowledged* receipt of the letter but took certain positions *about* the letter. It was not until the evidentiary hearing that Seasons 52 first suggested that it never received this "expansion letter." Seasons 52 explained, in response to a question from the Undersigned at the second evidentiary hearing, that it did not realize that non-receipt was an issue until it began to prepare its witnesses for the evidentiary hearing.

[ECF No. 259-1]. Seasons 52 produced applications submitted at the Costa Mesa location on December 5, 2011. [ECF No. 259-2]. The EEOC never explicitly requested applications submitted at the Jacksonville or Kansas City locations or objected to their non-production.

### iv. The EEOC Issued Letters of Determination

On July 16, 2013, the EEOC issued Letters of Determination. [ECF Nos. 246-9; 246-10]. The Determinations did not identify any particular hiring practice as discriminatory. *Id.* Investigator Gonzalez could not recall if she recommended to Seasons 52 that it change any hiring practice or if she told Seasons 52 who was in the "class" that the EEOC vaguely referenced, whether the class included front and back-of-the-house employees, or hourly or salaried employees, or how many people the EEOC estimated to be in the class. [ECF No. 242, ¶ 82].

In December 2013, after the EEOC had closed its investigation, an EEOC Investigator requested information for restaurants outside the 11 (Coral Gables and ten others) that the EEOC had potentially included in its investigation. On December 2, 2013, Seasons 52's counsel wrote to Investigator Gonzalez and stated that it was "puzzling" that the EEOC would ask for information pertaining to "all" restaurants after the EEOC had declared that it had concluded its investigation. [ECF No. 259-7]. Seasons 52 did not provide additional information. *Id.* On May 23, 2014, the EEOC issued letters declaring an end to conciliation. [ECF No. 246-10, ¶ 29].

### v.        Seasons 52 Produced Voluminous ESI During Discovery

After negotiating with the EEOC for months regarding an ESI stipulation, Seasons 52 collected all available email and workstation documents from over 100 custodians. [ECF No. 259-3, ¶¶ 2–3]. Over the subsequent months, Seasons 52 continued to investigate and collect ESI for an ever-growing list of additional custodians demanded by the EEOC. [ECF No. 259-3, ¶ 4]. In total, Seasons 52 collected over 2,300 gigabytes of data, totaling more than 5,500,000 unique documents. *Id.* Seasons 52 then applied more than 1,500 negotiated, broad search terms to the collected data. [ECF No. 259-3, ¶ 5]. The searches returned approximately 620,000 documents for review and cost hundreds of thousands of dollars to complete. *Id.* About 31,000 ESI records, totaling in excess of 110,000 pages, were produced. [ECF No. 259-3, ¶ 6].[10]

Seasons 52 contends that the emails' value was marginal at best, and only a small number were deemed worthy of submission to the Court in its summary judgment filings.

---

[10]        The Undersigned is not typically swayed by the sheer volume of ESI or other documents produced in discovery. If, for example, a party produced 500,000 documents totaling more than 2 million pages but failed to produce the one-paragraph "smoking gun" email, then the non-production of one page would be far-more significant than the production of 2 million pages. In this case, to provide a hypothetical illustration, a one-sentence email from a Seasons 52 executive reminding regional managers of an "unstated but long-understood policy of a preference for younger servers and a reluctance to hire older applicants unless they were truly outstanding," which was not produced in discovery, would likely be more significant than thousands of documents parroting an official company standard of having no hiring preferences.

## C. *The Evidentiary Hearings*

### i. **The First Evidentiary Hearing**

Six witnesses testified at the first evidentiary hearing. The EEOC and Seasons 52 each called an expert witness. Two of the other witnesses were Seasons 52 attorneys. A Seasons 52 in-house records coordinator also testified, as did an executive from its litigation support vendor.

The Undersigned is not going to summarize here all the testimony from all six witnesses. Instead, this Order will discuss only the relevant highlights. And the summary will not be in the order in which the witnesses testified.

#### 1. *Dawn Stoewe*

Formerly known as Dawn Rodda, Dawn Stoewe is senior vice president of litigation and employment for Seasons 52.[11] In 2010, she was senior associate counsel in the employment law area. She did not retain outside counsel for Seasons 52 after it received the EEOC's notice of charge for Alfaro. And she did not retain outside counsel during the investigation. She did, however, retain counsel for the conciliation process. Stoewe acknowledged that the EEOC's initial notice lists the record-keeping requirement -- i.e., preserving the payroll and personnel records until disposition of the charge.

---

[11] Technically, Stoewe works for Darden, a company which owns several restaurant chains, including Seasons 52. For convenience, the Undersigned is using the Seasons 52 reference.

Stoewe issued a litigation hold to Marcoe at the Coral Gables restaurant and to the head of employee relations and the head of the Human Resources Department. She also sent a copy to Seasons 52's IT Department, to implement the litigation hold. Stoewe said that she did not necessarily think that litigation was anticipated when she issued the litigation hold. The litigation hold concerned only the two claims of discrimination in the one Coral Gables restaurant.

Dated December 10, 2010, the EEOC's notice of charge for Alfaro was sent to the general manager of the Seasons 52 Coral Gables restaurant. Box 1 on the form notice was checked -- "no action is required by you at this time." [ECF No. 246-4, p. 1]. Page 2 of the notice, however, explained the EEOC's "Rules and Regulations" for "Charges of Discrimination." [ECF No. 246-4, p. 2]. It referred the recipient to 29 CFR Part 1602 and explained that these regulations "generally require respondents to preserve **payroll and personnel records** relevant to a *charge* of discrimination until disposition of the *charge* or litigation relating to the *charge*." *Id.* (emphasis added). Stoewe said that she "may" have received this Notice. Either way, though, she issued a litigation hold for the Coral Gables restaurant.

Stoewe agreed that she and EEOC Investigator Gonzalez had an email exchange in September 2011 concerning the agency's request for additional information and documents for all Seasons 52 restaurants which existed in the United States and its territories during the relevant time period. She advised Investigator Gonzalez that

Seasons 52 would need to create reports in order to comply but testified that she does not agree that she was considering the possibility of litigation at that point.

Stoewe was asked questions about Investigator Gonzalez's September 1, 2011 letter, which expressly references (in the "Re" line in the center of the letter) only the two charges from the Coral Gables restaurant. [ECF No. 246-6, p. 1]. The first sentence of the letter, however, mentions "the expansion of the case," a status which the letter listed as the reason for the EEOC's position that it "requires additional information and records" for restaurants other than the Coral Gables one during the relevant time period. *Id.* The letter defines the relevant time period as beginning "300 days preceding the date the Scornavacca case was filed, which begins on or about February 1, 2010 to present." [ECF No. 246-6, p. 3].

Stoewe further testified that she did not know that the EEOC was expanding the investigation to include other restaurants. Instead, she said that her belief was that the EEOC was merely requesting documents from other restaurants in connection with the existing, limited investigation into two charges arising from the one Coral Gables restaurant.

Concerning the August 31, 2011 letter, Stoewe testified that she first saw it the day before the hearing (i.e., in October 2017). She also testified about her belief that no one from Seasons 52 ever received the August 31, 2011 letter.

Although the September 1, 2011 letter, which Seasons 52 did receive, requested

booklets and applications for other Seasons 52 restaurants, Stoewe did not issue a litigation hold for those restaurants.

By 2012, Stoewe had transferred primary responsibility for the matter to another in-house attorney, Seth Rivera, whom she supervises. She recalled discussing a July 16, 2013 EEOC letter to Rivera. Entitled "LETTER OF DETERMINATION," the letter concerns only the charge filed by Alfaro. [ECF No. 246-9]. The second page of the letter says that the evidence "supports a finding that Respondent [i.e., Seasons 52] engaged in a pattern or practice of not hiring individuals who are over the age of 40 at its Season 52 restaurants **throughout the United States**." [ECF No. 246-9, p. 4 (emphasis supplied)]. The letter also says that the EEOC would advise of "the **court enforcement alternatives** available to the Commission" if Seasons 52 "declines to discuss settlement or when, for any other reason, a settlement acceptable to the office Director is not obtained." *Id.* (emphasis added).

Despite the "throughout the United States" language, Stoewe testified that she construed the letter as concerning only the one charge (from Alfaro) at the one restaurant and immediately questioned the EEOC's comments and conclusions beyond the one charge. She also said that she did not think the letter meant that litigation was imminent (even though it mentions "court enforcement alternatives"). In addition, she did not, after receiving this letter, issue a litigation hold to supplement the earlier-issued one for the Coral Gables restaurant.

The EEOC filed its lawsuit against Seasons 52 on February 12, 2015, and Seasons 52 issued a litigation hold beyond the Coral Gables restaurant approximately three months later.

Stoewe did not personally interview all the custodians of Seasons 52's documents and ESI, although someone from its legal team interviewed *some* of the custodians.

When questioned by Seasons 52's counsel, Stoewe explained that Investigator Gonzalez never told her that she was looking into the EEOC charges at other Seasons 52 restaurants. Likewise, she said she never asked Investigator Gonzalez what she meant by the term "expanded investigation."

In a September 30, 2011 letter to the EEOC, Stoewe listed the 10 other restaurant locations during the relevant time period. The lawsuit concerns **35** Seasons 52 locations. Stoewe said that she did not realize until the lawsuit was filed that the EEOC was focusing on hiring at new restaurant openings.

Stoewe said that she never instructed anyone to destroy records and never intended to deprive the EEOC of information.

### 2.      *Seth Rivera*

Rivera is a senior associate counsel at Seasons 52.[12] He testified that he never saw the August 31, 2011 letter until the week of the October 2017 hearing. He testified that this letter is not in Seasons 52's files and he does not recognize it. He *does* recall the

---

[12]      Like Stoewe, Rivera technically works for Darden.

September 1, 2011 letter, though. He said that he always viewed the scope of the EEOC's investigation as the two charges at the one Coral Gables restaurant even though the agency asked for records from other restaurants and mentioned an expanded scope.

Rivera, who took over day-to-day responsibility for the two charges in the September through December 2011 timeframe, said that he did not issue a litigation hold because he was already himself holding information sent to him by the restaurants. He testified that he did not consider the July 16, 2013 letter (which mentioned an unlawful hiring practice pattern "at Seasons 52 restaurants throughout the United States") to generate grounds for a litigation hold beyond the initial one for only the Coral Gables restaurant.

According to Rivera, Investigator Gonzalez never said that she or the EEOC were investigating other locations. He pointed out that she never identified any other charging parties. He "believes" that he asked Investigator Gonzalez why she was asking for information about other restaurants, but that she was "not forthcoming." In 2012, Investigator Gonzalez asked to interview managers affiliated with the 10 restaurants Seasons 52 identified as being in operation during the relevant time period. But he said that this development did not cause him to conclude that the EEOC's investigation had expanded beyond the one restaurant.

In a December 2, 2013 email to Investigator Gonzalez, Rivera complained about the EEOC's request for information concerning all Seasons 52 restaurants, not merely

the 10 restaurants previously mentioned. [ECF No. 316-21].

Rivera said that the EEOC's conciliation proposal did not identify a class, did not identify other class members, and did not identify specific employment practices. He did not issue a litigation hold when he realized the case would not be resolved in conciliation because the investigation (where a litigation hold had been issued) was complete.

Rivera said that he does not recall seeing a January 10, 2014 letter from Seasons 52 paralegal Dubinsky (who mentioned that certain evidence "refutes the allegation that Seasons 52 maintains a **nationwide hiring policy** that discriminates against individuals over the age of 40"). [ECF No. 316-15 (emphasis added)].

### 3.    *Terry Carter*

Terry Carter is now a legal specialist. At times relevant to the sanctions motion, he was a Season 52 records coordinator.[13] During discovery, Season 52 designated him as a Rule 30(b)(6) witness to provide deposition testimony about its records retention policies. At the hearing, he testified about Season 52's written "records retention" policy, which has a May 12, 2010 effective date. [ECF No. 246-13].

Page 2 of Season 52's policy contains a section entitled "Record Hold." [ECF No. 246-13, p. 2]. It discusses the steps Season 52 will take "in the event of a lawsuit, **investigation** or audit[.]" *Id.* (emphasis added). It says that Season 52 "will take all

---

[13]    To be specific and technical, he works for Darden.

reasonable efforts to preserve Business Records and Non-Business Records relevant to the matter." *Id.* It further provides that "an in-house Company attorney <u>will</u> issue a notice of Record Hold to inform Employees of the Records that must be retained **until the issue is resolved**." *Id.* (emphasis added). The provision also notes that Seasons 52 "recognizes its duty to not destroy relevant Records under applicable laws, <u>even if</u> those Records no longer serve a valid business purpose or would otherwise be subject to destruction under the Schedule." *Id.* (emphasis in original).

Page 6 of Darden's policy is part of Appendix A, which provides definitions. [ECF No. 246-13, p. 6]. "Record hold" is defined, in part, as follows: "An announcement that destruction of Business Records should be halted until further notice by the responsible in-house Company attorney." *Id.* The definition also notes that a Record Hold may be issued because of, among other reasons, "a **threatened legal proceeding**" or a "**government investigation or audit**." *Id.* (emphasis added). The definition also provides that a Record Hold "**trumps the destruction of Records** that would otherwise be permitted under the Record Retention schedule." *Id.* (emphasis added). Finally, the definition notes that "[o]nce the Record Hold is lifted by the responsible in-house Company attorney, Records may again be destroyed according to the Records Retention Schedule." *Id.*

Seasons 52's newer records retention policy went into effect in January 2013. [ECF No. 246-12]. The "Record Hold" section is on page 5. [ECF No. 246-12, p. 5]. Its

first sentence is: "In the event of a lawsuit, **investigation** or audit, the Company will take all reasonable efforts to preserve Business Records and Non-Business Records relevant to *the matter*." [ECF No. 246-12, p. 5 (emphasis added)]. It then explains that, "[f]or **all** matters, an in-house Company attorney *will* issue a notice of Record Hold to inform Employees of the Records that **must be retained** until *the issue* is resolved." *Id.* (emphasis added). This newer records retention policy also specifically mentions emails: "Information Technology collects all emails available in the custodian's **email box** on the **day the hold is sent out** and continues to save all emails (sent and received) until the hold is released." *Id.* (emphasis added).

Page 12 of Seasons 52's January 2013 records policy discusses the "Litigation Hold" measures. [ECF No. 246-12, p. 12]. It establishes the procedure "if a Litigation Hold has been issued" by the law department: "the destruction of relevant copies of Business Records *must be suspended* until notified by the issuing department." *Id.* (emphasis in original). Page 16 of the policy has a section entitled "Records under Record/Litigation Hold." [ECF No. 246-12, p. 16]. It says: "If your records are under a Record/Legal Hold, ***do not destroy records you are required to maintain until you have been advised by the law department to do otherwise. This includes copies and all formats.***" *Id.* (emphasis in original).

Seasons 52 also had a "Records Retention Schedule" which Carter said was in effect from 2013 onward. He said that Seasons 52 used a different schedule before 2013.

In a declaration he signed (and which the EEOC submitted in this case [ECF No. 246-11, p. 3]), however, Carter said that the records retention schedule was in effect from 2010 to 2012. He conceded at the hearing that his declaration was incorrect on that point. He further testified that he did not know whether Seasons 52's records retention schedule from 2010 to 2013 was ever produced to the EEOC.

According to page 13 of the schedule which went into effect in 2013, Seasons 52 was required to keep for three years records regarding "employee selection / recruiting," and it was also required to keep for six years documents regarding "specific employees," which includes documents about "hiring." [ECF No. 306-6, p. 14].

In addition, page 34 of the schedule requires Seasons 52 to retain documents for "Claims and Litigation" for what it describes as "ACT + 10," which means "while active plus years shown." [ECF No. 306-6, pp. 13, 35]. The description of "Claims and Litigation" materials are "records related to threatened or asserted litigation or **government investigation**." [ECF No. 306-6, p. 35 (emphasis added)]. Therefore, the policy required Seasons 52 to keep documents and other materials concerning the EEOC's "government investigation" for at least 10 years after it was no longer active. (Of course, determining the *scope* of the EEOC's investigation is a critical and necessary component of concluding whether Seasons 52's own procedures manual required the retention of materials for restaurants other than Coral Gables and, if so, when the obligation was triggered.)

According to Carter's declaration, the first litigation hold Seasons 52 initiated was done on December 16, 2010, and it was issued by Stoewe. [ECF No. 246-11, ¶ 21]. His declaration further notes that a second litigation hold was issued on May 27, 2015 (about three months after the lawsuit was filed). [ECF No. 246-11, ¶ 20]. He is not aware of any other litigation hold which Seasons 52 implemented in the case. At the hearing, Carter said that he was not aware of the subject matter of the May 2015 litigation hold. But in his Rule 30(b)(6) deposition, he testified that the litigation hold covered application materials and interview booklets. [ECF No. 246-14, p. 62:15–23].

Carter also explained that he learned, as part of the process of being transformed into Season 52's Rule 30(b)(6) witness on records retention, that Season 52 collected paper applications and interview booklets from 11 locations (Coral Gables plus 10 others) in 2011.

For restaurants other than the 11 locations, Carter explained that Season 52 did not start collecting records until late 2015 or early 2016. Moreover, he said that he never heard that the litigation team actually went to any locations to collect documents other than the Coral Gables restaurant. Carter also said that a December 31, 2015 fire at the Kansas City location destroyed records.

### 4.    *Roger Smith*

Roger Smith is the chief information officer and managing director of e-discovery services for Strategic Legal Solutions ("SLS"), a litigation support vendor. He

has worked in the e-discovery field for 14 years. Seasons 52 retained SLS in late 2015 (which is many months after the lawsuit was filed). SLS received 2.5 terabytes of ESI, consisting of 12.5 million documents. He did not know how many pages of ESI were submitted.

Smith explained that SLS organized the ESI by custodian, which does not have to be a person. A location or a department, for example, can be a custodian. He said that SLS obtained ESI from 130 custodians, mostly individuals and specific restaurants. SLS de-duped (short for de-duplicated, which means to remove duplicate copies of the same document) the entire 12.5-million document production, leaving 5.5 million documents. Search terms were applied to the 5.5 million documents, which led to the finding of 665,000 documents. Of those, 30,000 were deemed responsive and not privileged and were therefore produced.

Smith said that he disagreed with the EEOC's contention that it did not receive in discovery emails from custodians on a list. He said that 8,000 emails were attributable (meaning the individual was in the "to," "from," "cc" or "bcc" fields) to the individuals.

According to Smith, Seasons 52 spent more than $700,000 in e-discovery projects for this lawsuit.

**5.** *Dr. David Neumark*

Dr. Neumark is the EEOC's expert witness. A labor economist, Dr. Neumark concluded, by way of summary, that the evidence is consistent with age discrimination

by Seasons 52 in its restaurants.

He explained that he thought he was missing "an awful lot" of paper applications. For those restaurants where he received an adequate sample, he could perform a straightforward analysis. For the others, he needed to use external benchmarks in order to perform the comparison necessary for his analysis.

He also explained that he could not analyze paper applications at some locations. He used electronic application data for his analysis and used paper applications when they were available and appeared unbiased. For three restaurants, however, he had no electronic applications and only suspect or biased paper applications, so he was forced to use external benchmarks. On cross-examination, he conceded that he cannot conclusively say that paper applications from three restaurants were in fact missing and that he had no evidence that Seasons 52 actually destroyed or lost the paper applications.

In addition, Dr. Neumark conceded on cross-examination that he cannot opine on the number of missing applications from the three restaurants and does not know how many of the applicants are under or over 40-years old.

Dr. Neumark said that he would have included paper applications in his analysis if they had been available.

Although Dr. Neumark was able to reach certain conclusions and render opinions, he said that his results would have been "statistically stronger" with "an

increase in precision" if more information had been provided. But he conceded on cross-examination that he has never taken the position that his conclusions were compromised or are invalid because of the missing information.

### 6. *Dr. Ali Saad*

Dr. Ali Saad, a labor economist, is Seasons 52's expert witness. He was retained "several years ago" but he was not given a specific assignment in this lawsuit until late 2016 or early 2017. He received Dr. Neumark's report and prepared his own report.

Basically, Dr. Saad criticized the methodology and analysis used by Dr. Neumark. Concerning the spoliation issue, however, Dr. Saad said that the missing data did not prevent him from offering reliable opinions. He said that he is aware of the EEOC's spoliation argument concerning the paper applications which are missing from the three restaurants but made two points about it: (1) other steps could be taken, and (2) at an aggregate level (a method Dr. Neumark used that differs from a restaurant-by-restaurant approach), the impact would not be substantial.

In addition, Dr. Saad testified that the absence of paper applications from the Jacksonville or Kansas City stores would not have impacted Dr. Neumark's opinions because he had all the electronic application data from those locations.

### ii. The Follow-Up Evidentiary Hearing

The Undersigned required a second, follow-up evidentiary hearing in order to obtain testimony from the EEOC's lead investigator and from Seasons 52's primary in-

house paralegal. The specific reason concerns the August 31, 2011 letter, which Seasons 52 now contends it did not receive. That letter is the one where Investigator Gonzalez advised Seasons 52 that the scope of the EEOC's investigation was expanding to include the hiring practices of the Seasons 52 restaurants "throughout the nation." This is the letter which the EEOC points to (among others) to support its argument that Seasons 52 was under a duty to preserve documents for **all** Seasons 52 restaurants throughout the entire country during the time frame at issue.

The EEOC did not send the August 31, 2011 letter by certified mail, return receipt requested; overnight mail; or other form of delivery which would confirm receipt. The letter itself did not say that it was also being sent to Seasons 52 by email. In addition, Seasons 52 argued that the letter has several other aspects that are odd and support its current position that it never received the letter: (1) Investigator Gonzalez's signature is completely different from her signature on a letter dated the very next day; (2) the letter contains an incorrect zip code; and (3) the phone number under Investigator Gonzalez's name is incorrect because it is missing one number. Seasons 52 also contends that it does not have a copy of the letter in its own records and that although it received a letter dated September 1, 2011 from Investigator Gonzalez which mentions "expansion of the case," that letter does not say how the case had expanded.

The Undersigned thought it important to receive testimony from Seasons 52's in-house paralegal because a later letter she wrote to the EEOC seemingly contradicts

Seasons 52's position that it never realized the investigation was actually a *national* investigation, extending beyond Coral Gables. Specifically, Dubinsky wrote a January 10, 2012 letter to Investigator Gonzalez which said that certain evidence produced by Seasons 52 to the EEOC "refutes the allegation that Seasons 52 maintains a **nationwide** hiring policy that discriminates against individuals over the age of 40." [ECF No. 306-22, p. 3 (emphasis added)]. The Undersigned therefore scheduled a follow-up hearing in order to receive testimony from Investigator Gonzalez and Dubinsky.

### 1.    *Investigator Katherine Gonzalez*

Now a supervisory investigator, Katherine Gonzalez was an EEOC investigator at times relevant to this motion. She started investigating charges of age discrimination at the Seasons 52 Coral Gables restaurant after Alfaro filed a charge of age discrimination in 2010.

According to Investigator Gonzalez, the scope of her investigation changed and expanded to cover **all** Seasons 52 restaurants nationwide. She testified at length about the August 31, 2011 letter (which she calls the "expansion letter") and her September 1, 2011 letter (which she calls the "request for information" or "RFI" letter).

Investigator Gonzalez testified that she personally signed both letters. She acknowledged that her signatures appear significantly different but explained that she has "two" signatures and uses them "interchangeably." One signature is used when she is in a hurry, and it is a squiggly-type signature, while the other is a more-deliberate

signature. But she used the more-deliberate signature on the August 31, 2011 letter, which is only about a third of a page, and used the quick-type signature on the two-and-a-half page September 1, 2011 letter. She does not have an explanation for this but did not question the logical assumption that the squiggly signature would have been used for the shorter, August 31st letter (even though it wasn't).

Investigator Gonzalez said that she sent both letters by email and standard mail. It is not her practice to send letters by certified mail, nor is it her practice to write "via email" or to make a similar note on the actual letters either. She explained that her handwritten investigative case log confirms that the August 31, 2011 letter was in fact sent by both email and standard mail to Seasons 52. [ECF No. 316-5, p. 3].

She testified that the log is a running summary of the more-important developments in an investigation. The log, however, is not without its inconsistencies.

First, Investigator Gonzalez explained that the log shows that she sent the August 31, 2011 "expansion letter" on September 1st, not August 31st. Second, she did not log in sequential order the alleged September 1, 2011 mailing of both letters. Instead, she listed it after a September 7, 2011 entry and before a September 13, 2011 entry. She inserted an arrow next to the out-of-sequence September 1, 2011 entry to show that it should have been entered earlier (i.e., higher up on the log). The arrow, however, leads to a spot below the September 2, 2011 entry, not the August 31, 2011 entry. Third, the log does in fact have an entry for August 31, 2011. It shows that she interviewed two managers. But

it does not show that she drafted, edited, finalized, or mailed any letter on that same day.

In any event, her case log entry for September 1, 2011 says "mailed/email addt'l RFI to R & expansion letter." [ECF No. 316-5, p. 3]. The "R" refers to Respondent, which is Seasons 52. She testified that this entry refers to two separate documents: the additional RFI letter (dated September 1) and the expansion letter (dated August 31). But Seasons 52 suggested that this entry refers to only one letter -- the September 1, 2011 letter -- because the September 1 letter expressly mentions an "expansion" and *also* requests additional information. Therefore, according to Seasons 52's interpretation, the out-of-place log entry could easily refer to *only* the September 1 letter. But regardless of Seasons 52's after-the-fact argument, Investigator Gonzalez said that she is certain that she mailed both letters to Seasons 52 on September 1.

She did not remember if she placed both letters in one envelope to Seasons 52 or whether she placed each in a separate envelope.

But, either way, she does not have a copy of the email in her file, and her computer does not reflect an email dated August 31, 2011 or September 1, 2011 either. Similarly, in response to a question from the Undersigned, the EEOC's counsel represented that it searched her computer before the hearing and did not find any evidence of the email.

Investigator Gonzalez testified to her strong belief that Seasons 52 did in fact

receive the August 31, 2011 expansion letter. She said it was sent out at the same time as her September 1, 2011 letter, which Seasons 52 *did* receive. Also, although it too contained an incorrect zip code, the September 11 letter *was* received by Seasons 52.

In addition, Investigator Gonzalez said that she had conversations and communications with Seasons 52's counsel and legal staff in which they discussed her request for records from all Seasons 52 restaurants which were open in the nation at the time. And, she noted, Seasons 52 provided all the information she requested even though her requests involved records from across the entire country.

Similarly, Seasons 52 permitted her to interview managers from restaurants across the country, not merely at Coral Gables. Thus, she opined, it would be "nonsensical" for Seasons 52 to permit her to take all of these investigative steps if the scope of her investigation was only the one Coral Gables location.

Likewise, Investigator Gonzalez said that it is "hard to believe" that Seasons 52's attorneys would have received her September 1, 2011 letter (which they did) and not question the phrase "based upon the expansion of the case" if they actually were under the impression that the investigation concerned only one restaurant. The September 1, 2011 letter contained a definition of the relevant time period, and both sides agree that this definition encompasses 11 restaurants, including Coral Gables and Naples, which Investigator Gonzalez later learned had been opened before November 2nd.

During its examination of Investigator Gonzalez, the EEOC introduced a

February 2012 letter from Seasons 52, responding to her request for a list of restaurants across the country, divided by region. [ECF No. 316-16]. Seasons 52 responded and provided a list, which showed four directors for regions encompassing 21 restaurants. [ECF No. 316-17].

Investigator Gonzalez also noted that Seasons 52 permitted her to conduct telephone interviews of managers and that she asked them questions about restaurants other than Coral Gables.

She also highlighted the fact that she never received an "undeliverable" notice from the U.S. Postal Service for the August 31, 2011 letter. She said that she receives these notices "all the time."

To further bolster the EEOC's view that Seasons 52 knew of the national scope of the investigation, Investigator Gonzalez referred to a July 16, 2013 Letter of Determination for the charge filed by Alfaro. [ECF No. 316-19]. The letter mentioned that evidence revealed unlawful employment practices "at Respondent's Coral Gables restaurant and Respondent's restaurants **nation-wide**." [ECF No. 316-19, p. 1 (emphasis added)]. And it also said that "[t]he evidence, including statistical data, supports a finding that Respondent engaged in a pattern or practice of not hiring individuals who are over the age of forty at its Season 52 restaurants **throughout the United States**." [ECF No. 316-19, p. 3 (emphasis supplied)].

Investigator Gonzalez also explained that she spoke with Rivera on the telephone

about the findings before the Letter of Determination was actually issued. The EEOC calls this a "pre-determination interview" or "PDI." She said that she does not recall specifically mentioning to Rivera the Coral Gables restaurant during her PDI and that she did not provide a restaurant-by-restaurant status. She said that Rivera asked for the names of the class members and that she provided them to him.

During cross-examination, she conceded that in 2012 she was still requesting supplemental information only for the 10 restaurants (besides Coral Gables) which Seasons 52 identified as being open during the relevant time period. Other than adding the Naples restaurant to the list, she did not ask Seasons 52 for information on other restaurants. Moreover, she conceded that the EEOC evaluated only 19 restaurants when it issued its Letter of Determination (which mentioned "restaurants nationwide").

### 2. *Deborah Dubinsky*

Seasons 52's manager of employment disputes since 2016, Deborah Dubinsky was a senior paralegal in the employment group from 2008 to 2012, when she became associate manager of employment disputes. She testified that the day before the hearing was the first time she ever saw the August 31, 2011 expansion letter. She explained that she reviewed Seasons 52's file and database but the letter was not there. In addition, she said that Investigator Gonzalez never mentioned the letter to her during their communications in the EEOC's investigation.

According to Dubinsky's testimony, Stoewe asked her to draft a response to the

EEOC's September 1, 2011 letter. She complied with that request and said that her understanding was that 10 Seasons 52 restaurants were at issue. She signed "for" Stoewe (then known as Dawn Rodda) in Seasons 52's September 30, 2011 response to the September 1, 2011 letter. In addition, Stoewe asked her to collect applications for the 10 restaurants listed in Investigator Gonzalez's November 2, 2011 email to Stoewe. That list did not include the Coral Gables restaurant, but it did include Naples (because that restaurant opened shortly after).

Dubinsky said that at no time did she interpret any communication from the EEOC to indicate that the scope of its investigation extended beyond the 11 restaurants (the original one in Coral Gables and the additional 10 listed in the email). She said that Seasons 52 never pushed back when the EEOC asked for information and documents for restaurants other than Coral Gables because the EEOC "could have obtained it anyway through a subpoena."

Dubinsky explained that all restaurants responded to the request for information and that she kept the original applications sent in from the restaurants in the Seasons 52 employment law office.

Concerning her January 10, 2012 letter, in which she mentions allegations about a "nationwide hiring policy," Dubinsky said "nationwide" meant only "scattered across the country." She also said that she did not know if more than 10 Seasons 52 restaurants were open across the country, and she denied that her use of the word "nationwide"

meant **all** restaurants in the country. In fact, she said that the EEOC's allegation about hiring policy was merely for the "Scornavacca" case (which concerns Coral Gables).

Dubinsky said that she listened to all the telephone interviews which the EEOC conducted with managers, and then she explained that Investigator Gonzalez never asked the managers questions concerning restaurants other than the 10 on the list.

She also explained that she was not involved in responding to discovery requests after the EEOC filed this lawsuit, played no role in deciding whether to issue a litigation hold, and does not send out litigation holds.

Dubinsky said that she enjoyed a "pretty good" working relationship with Investigator Gonzalez, with whom she spoke approximately 50 times. She said that Investigator Gonzalez never told her that the EEOC was investigating Seasons 52 for any location other than those on the list, never mentioned that the investigation was on behalf of a class, and never explained that the investigation covered anything other than the two charges filed in connection with the Coral Gables restaurant. She summarized her direct testimony by saying that she made a good faith effort to preserve documents and ESI and never destroyed any responsive material. On cross-examination, she conceded that she did know that the EEOC's investigation included restaurants other than Coral Gables.

### D.    Post-Hearing Developments

After the follow-up evidentiary hearing, and in response to a Court-issued

directive [ECF No. 314], Seasons 52 submitted a notice confirming that it did **not** produce in discovery nine exhibits which the EEOC mentioned at the follow-up evidentiary hearing. [ECF No. 318]. Exhibit 135 is a March 23, 2011 email from Dubinsky to Investigator Gonzalez, forwarding a copy of a roster of employees hired since the opening of the Coral Gables restaurant. [ECF No. 316-22]. Exhibit 136 is an August 3, 2011 email from Dubinsky to Investigator Gonzalez, forwarding several job descriptions. [ECF No. 316-24]. The EEOC did not provide the Court with copies of the other exhibits at the hearing, although it did file them later. [ECF No. 316-25–31]. The two documents referenced above were encompassed by an EEOC request for production of documents, and the EEOC represented that the other seven documents were also covered by the same document request.

## II.     Applicable Legal Principles and Analysis

### A.     *Jurisdictional Authority*

Magistrate judges may issue orders on any "pretrial matter not dispositive of a party's claim or defense[.]" Fed. R. Civ. P. 72(a). Such an order may not be set aside unless it "is clearly erroneous or is contrary to law." *Id.*

Thus, magistrate judges have jurisdiction to enter sanctions orders for discovery failures which do not strike claims, completely preclude defenses, or generate litigation-ending consequences. Practice Before Federal Magistrates, § 16.06A (Mathew Bender 2010) ("discovery sanctions are generally viewed as non-dispositive matters committed

to the discretion of the magistrate unless a party's entire claim is being dismissed").

The critical factor used to determine whether a magistrate judge may enter an order on a requested discovery sanction is what sanction the magistrate judge *actually imposes*, rather than the one *requested* by the party seeking sanctions. *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519–20 (10th Cir. 1995) (rejecting argument that magistrate judge ruled on dispositive motion because litigant sought entry of a default judgment and explaining that "[e]ven though a movant requests a sanction that would be dispositive, if the magistrate judge does not impose a dispositive sanction," then the order is treated as not dispositive under Rule 72(a)); Wright, Miller & Marcus, Federal Practice and Procedure: Civil 2d § 3068.2, at 342-44 (West 1997).

Federal magistrate judges in this Circuit[14] frequently enter orders (as opposed to

---

[14] Federal magistrate judges in other circuits also routinely enter similar types of orders when the effect is not similar to a default judgment or does not preclude a defense. *See Moore v. Napolitano*, 723 F. Supp. 2d 167, 183–84 (D.D.C. 2010) (rejecting the argument that the magistrate judge entered a "severe sanction akin to a litigation-ending default judgment" and affirming the magistrate judge's order precluding the defendant from offering any legitimate, nondiscriminatory reason to rebut any prima facie case of disparate treatment discriminatory non-promotion of the individually named plaintiffs in an employment discrimination case).

In fact, other courts authorize magistrate judges to enter sanctions orders even when they **exclude** testimony. *See Exxon Corp. v. Halcon Shipping Co. Ltd.*, 156 F.R.D. 589, 590 (D.N.J. 1994) (reviewing magistrate judge's order precluding expert witness from testifying as a sanction for violating a pretrial discovery order under the clearly erroneous or contrary to law standard of review); *see also Carmona v. Wright*, 233 F.R.D. 270, 276 (N.D.N.Y. 2006) (explaining that magistrate judges are permitted to enter sanctions orders for discovery violations because they are "generally non-dispositive matters" unless the order imposes a sanction which "disposes of a claim, e.g., striking

reports and recommendations) in cases where parties seek sanctions, including default judgments or dismissals, for spoliation. *See, e.g., Calixto v. Watson Bowman Acme Corp.,* No. 07-60077-CIV, 2009 WL 3823390 (S.D. Fla. Nov. 16, 2009) (Rosenbaum, J.); *Atlantic Sea Co., S.A., v. Anais Worldwide Shipping, Inc.,* No. 08-23079-CIV, 2010 WL 2346665 (S.D. Fla. June 9, 2010) (Brown, J.); *Managed Care Solutions, Inc. v. Essent Healthcare, Inc.,* 736 F. Supp. 2d 1317 (S.D. Fla. 2010) (O'Sullivan, J.). Indeed, federal magistrate judges in Florida have entered orders imposing adverse inferences and attorney's fees as sanctions in spoliation scenarios. *Optowave Co., Ltd. v. Nikitin,* No. 6:05-cv-1083-Orl-22DAB, 2006 WL 3231422 (M.D. Fla. Nov. 7, 2006) (Baker, J.) (imposing adverse inference jury instruction based on intentional failure to produce highly relevant emails); *Preferred Care Partners Holding Corp. v. Humana, Inc.,* No. 08-20424-CIV, 2009 WL 982460, at *8 (S.D. Fla. Apr. 9, 2009) (Simonton, J.) (awarding costs and fees for "grossly negligent discovery conduct" leading to the destruction of emails when bad judgment, but not bad faith, was responsible for the errors).

Because an adverse inference instruction does not strike a claim or defense and the EEOC is not seeking harsher types of relief (such as an order striking Seasons 52's defenses or precluding testimony), this Order (assessing the viability of a requested adverse inference) concerns a non-dispositive issue that can be determined by a

---

pleadings with prejudice or dismissal"); *cf. San Shiah Enter. Co., Ltd. v. Pride Shipping Corp.,* 783 F. Supp. 1334 (S.D. Ala. 1992) (finding that magistrate judge was authorized to impose Rule 11 sanctions).

magistrate judge through an order under Rule 72(a) -- as opposed to a report and recommendations.

## B.    *Spoliation*

Spoliation refers to the destruction of evidence or the significant and meaningful alteration of a document or instrument. *Green Leaf Nursery v. E.I. DuPont de Nemours & Co.,* 341 F.3d 1292, 1308 (11th Cir. 2003). But it is sometimes also defined as the "*intentional* destruction, mutilation, alteration or concealment of evidence, usually a document." *Calixto,* 2009 WL 3823390, at *13 (emphasis added) (internal citation omitted); *see also Se. Mech. Servs, Inc. v. Brody*, No. 8:08-CV-1151-T-30EAJ, 2009 WL 2242395, at *2 (M.D. Fla. July 24, 2009) ("the intentional destruction or concealment of evidence").

The courts in this Circuit have not always been consistent in providing a definition of "spoliation." Some definitions include the word "intentional," while others do not.[15] Because the Eleventh Circuit's decisions in *Green Leaf Nursery and Oil Equipment* did not include "intentional" in its definition of the destruction of evidence

---

[15]    For example, the "intentional" component *is* included in the spoliation definitions in *Optowave Co., Ltd.,* 2006 WL 2321422, *Se. Mech. Servs.,* 2009 WL 2242395, and *Calixto,* 2009 WL 3823390. The "intentional" factor is not included in *Graff v. Baja Marine Corp.,* 310 F. App'x. 298 (11th Cir. 2009). *Graff,* however, is a "not for publication" opinion based, in part, on Georgia law. On the other hand, there is no "intentional" requirement found in the court's spoliation definition in *Corporate Fin., Inc. v. Principal Life Ins. Co.,* No. 05-20595-CIV, 2006 WL 3365606 (S.D. Fla. Nov. 20, 2006).

requirement for spoliation, the Court will not include that requirement. 341 F.3d at 1308.[16]

In meeting the requirement to demonstrate that the spoliated evidence was crucial to the movant's ability to prove its *prima facie* case or defense, it is not enough that the spoliated evidence would have been relevant to a claim or defense. *Managed Care Solutions*, 736 F. Supp. 2d at 1327–28 (finding that the allegedly spoliated evidence was not crucial to the plaintiff's claims because it could still prove its case through other evidence already obtained elsewhere); *see also Floeter v. City of Orlando,* No. 6:05-cv-400-Orl-22KRS, 2007 WL 486633, at *6 (M.D. Fla. Feb. 9, 2007) (finding that although missing emails were relevant to the plaintiff's case, they were not critical and would have been cumulative).

Parties can ask trial courts to permit them to introduce into evidence at trial the *circumstances* surrounding their opposition's failure to retain and produce evidence, including emails, even when the trial court rejects the request for an adverse inference jury instruction. *Managed Care Solutions,* 736 F. Supp. 2d at 1334.

A court has broad discretion to impose sanctions for litigation misconduct based on its inherent power to manage its own affairs. A finding of bad faith, however, is

---

[16] The Eleventh Circuit's latest opinion on spoliation, albeit in an unpublished opinion, also did not use the term "intentional." *Oil Equip. Co. Inc. v. Modern Welding Co. Inc.,* 661 F. App'x 646, 652 (11th Cir. 2016) ("Spoliation refers to the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.").

required to impose sanctions based upon the court's inherent power. *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995).

The district court has broad discretion to control discovery, including the ability to impose sanctions on uncooperative litigants. *Phipps v. Blakeney*, 8 F.3d 788, 790 (11th Cir. 1993).

In this Circuit, sanctions for spoliation of evidence may include "(1) dismissal of the case [or default judgment against the defendant]; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation which raises a presumption against the spoliator." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 945 (11th Cir. 2005); *see also Walter v. Carnival Corp.*, No. 09-20962-CIV, 2010 WL 2927962, at *2 (S.D. Fla. July 23, 2010).

In this case, the EEOC urges the third type of sanction -- imposition of an adverse inference. But there are different types of adverse inferences, ranging in differing and ever-increasing levels of harshness. One type results in a jury being instructed that certain facts are deemed admitted and must be accepted as true. Another type results in the imposition of a mandatory, albeit rebuttable, presumption. A third type permits a jury to presume that the lost evidence is relevant and favorable to the innocent party. With this third type of adverse inference, the jury also considers the spoliating party's rebuttal evidence and then decides whether to draw an adverse inference.

Stressing that Seasons 52's destruction of documents violates generally applicable EEOC regulations and that Seasons 52 also failed to timely implement an

adequate litigation hold, the EEOC also notes that Seasons 52 shredded application data after it knew that the EEOC expanded its investigation to the national level. The EEOC also argues that Seasons 52's position that it has "no knowledge" of documents being lost or destroyed is not credible. Therefore, the EEOC seeks several bad faith-based permissible inferences and the exclusion of certain data analysis and theories.

In addition, the EEOC contends that the Court may preclude Seasons 52 from making certain arguments at trial and at summary judgment, provide a jury instruction on a less-harsh adverse inference about spoliation, and award attorney's fees and costs if the Court finds that Seasons 52 failed to preserve data it had a duty to preserve but failed to do so in bad faith.

As the party seeking spoliation sanctions, the EEOC has the burden of proof. "[T]he party seeking [spoliation] sanctions must prove . . . first, that the missing evidence existed at one time; second, that the alleged spoliator had a duty to preserve the evidence; and third, that the evidence was **crucial to the movant being able to prove its prima facie case or defense**." *Walter*, 2010 WL 2927962, at *2 (citing *Floeter*, 2007 WL 486633, at *5) (emphasis added); *see also Managed Care Solutions*, 736 F. Supp. 2d at 1322.

**C.** *Bad Faith Requirement*

In this Circuit, "[a] party's failure to preserve evidence" rises to the level of sanctionable spoliation "only where the absence of that evidence is predicated on bad

faith," such as where a party purposely "tamper[s] with the evidence." *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997); *see also Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1294 (11th Cir. 2003) (holding no adverse inference from missing label because there was no indication of bad faith).

Although the Eleventh Circuit indicated in *Flury* that bad faith is only **a** factor to consider under Georgia spoliation law, 427 F.3d at 945, *Flury* does not stand for the proposition that bad faith is not required in this Circuit for an adverse inference jury instruction based on spoliation of evidence. Several reasons support this conclusion.

First, *Flury* construed Georgia spoliation law (not federal or Florida spoliation law). Second, *Flury* was "a panel decision and as such did not overrule the prior panel decision in *Bashir*, requiring a showing of bad faith." *Managed Care Solutions*, 736 F. Supp. 2d at 1328, n.16 (noting that only the Supreme Court or an *en banc* decision from the Eleventh Circuit can judicially overrule a prior panel decision). Third, in several cases following the 2005 *Flury* decision, the Eleventh Circuit specifically and unequivocally held that bad faith **is** required for an adverse inference instruction as a sanction for spoliation. *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009) (noting that a showing of malice is not required to find bad faith but emphasizing that an adverse inference can be "drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith") (internal quotation omitted); *Cox v. Target Corp.*, 351 F. App'x 381, 383 (11th Cir. 2009) (holding that "a jury

instruction on spoliation of evidence is required only" when bad faith is responsible for the absence of the evidence); *BP Prods. N. Am., Inc. v. Se. Energy Grp., Inc.*, 282 Fed. App'x 776, 780 n.3 (11th Cir. 2008) (holding that an adverse inference presumption was appropriate where the district court implicitly determined that the defendant's actions were predicated on bad faith).

Additionally, in its relatively recent *Oil Equipment* decision, the Eleventh Circuit cited *Flury* for the rule that a dismissal sanction for spoliation "should only be exercised where there is a showing of bad faith and where lesser sanctions will not suffice." *Oil Equip. Co.*, 661 F. App'x at 653 (citing *Flury*, 427 F. 3d at 944). The *Oil Equipment* decision went on to explain:

> With regard to the spoliator's culpability, this circuit does not require a showing of malice in order to find bad faith, but we do require something more than mere negligence. Generally, bad faith may be found where the plaintiff's actions are responsible for the spoliation of evidence and the plaintiff fully appreciated the significance of the evidence to the anticipated litigation.

*Id.* (internal citations and quotations omitted).

Phrased differently, mere negligence in losing or destroying records or evidence is insufficient to justify an adverse inference instruction for spoliation. *Bashir*, 119 F.3d at 931. The Eleventh Circuit's rule precluding an adverse inference in the face of simple negligence is that "it does not sustain an inference of consciousness of a weak case." *Id.* (internal quotation omitted); *see also Slattery v. Precision Response Corp.* 167 F. App'x 139, 141 (11th Cir. 2006).

Given this Circuit's requirement that an adverse inference flowing from spoliation requires the presence of bad faith, even grossly negligent discovery conduct does not justify that type of jury instruction. *Preferred Care Partners Holding Corp.*, 2009 WL 982460 at *7 (declining to order adverse inference even though party's performance in fulfilling discovery obligations was "clearly egregious" and even though the party's discovery failings "resulted from the grossly negligent oversights of counsel").

Because this Circuit, unlike some others, requires bad faith before permitting an adverse inference jury instruction when there is spoliation of evidence, courts deny the requested instruction when no bad faith is shown. *Slattery*, 167 F. App'x at 141 (holding that employer's failure to produce documents did not justify an adverse inference because plaintiff had demonstrated "no evidence [of withholding] or tampering with any of the documents in bad faith"); *see also Penalty Kick Mgmt.*, 318 F.3d at 1293–94 (no evidence of bad faith in losing label at issue in lawsuit alleging improper disclosure of trade secrets).

In fact, district courts in our Circuit regularly deny adverse inference requests even when there is an indisputable destruction of evidence. *Socas v. Nw. Mut. Life Ins. Co.*, No. 07-20336, 2010 WL 3894142 (S.D. Fla. Sept. 30, 2010) (denying motion to dismiss and for adverse inference jury instruction when doctor negligently failed to suspend her ordinary policy of purging inactive patient files after learning the information in those files was relevant to her disability claim); *Walter*, 2010 WL 2927962 (missing broken deck

chair in lawsuit for injuries sustained when plaintiff's deck chair collapsed while he was a cruise ship passenger); *Atlantic Sea Co.,* 2010 WL 2346665 (failure to preserve spotlight and electrical wiring); *Calixto,* 2009 WL 3823390 (missing emails); *see also United States v. Barlow,* 576 F. Supp. 2d 1375, 1381 (S.D. Fla. 2008) (loss of PVC marker used to identify the location of a ship's grounding in a lawsuit brought by the government for damage to underwater sanctuary resources when defendant's boat ran aground).

Parties can establish the requisite bad faith through either direct or circumstantial evidence. *Calixto,* 2009 WL 3823390, at *16. In order to demonstrate that a party destroyed evidence in bad faith through circumstantial evidence, the movant must establish *all* of the following four factors: (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence;[17] and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator. *Calixto,* 2009 WL 3823390, at *16 (emphasis added); *see also Managed Care Sols.,* 736 F. Supp. 2d at 1331–32 (adopting four-factor test for circumstantial evidence of bad faith).

When a party's actions lead to the destruction of evidence but were **not** done in

---

[17]     Given this third factor to establish bad faith through circumstantial evidence, the issue of whether Seasons 52 knew of a duty to preserve evidence at restaurants other than the Coral Gables location (or even the 10 restaurants which the parties drew on for information requests and responses before this lawsuit was filed) is significant.

bad faith, then sanctions are inappropriate -- but this result "is not intended to preclude [the prejudiced party] from introducing into evidence the facts concerning the failure to preserve relevant [evidence]." *Socas*, 2010 WL 3894142, at *9. Thus, an order denying spoliation sanctions would not be the death knell for the EEOC's efforts to present Seasons 52's actions (or inactions) to a jury.

The Eleventh Circuit has not decided the appropriate evidentiary standard to use when the requested sanctions are based upon the Court's inherent powers. Nevertheless, the Undersigned finds persuasive a decision by U.S. Magistrate Judge Andrea Simonton in *In re Brican America LLC Equipment Lease Litigation*, 977 F. Supp. 2d 1287 (S.D. Fla. 2013).

In *Brican*, the court adopted two different evidentiary burdens, depending on the nature of the sanction imposed. For "issue-related" sanctions -- "those that are fundamentally remedial rather than punitive and do not preclude a trial on the merits" -- the proof must be by a **preponderance of the evidence**. *Id*. at 1293 n.6 (quoting *Compton v. Alpha Kappa Alpha Sorority, Inc.,* 938 F. Supp. 2d 103, 104-05 (D.D.C. 2013)). In contrast, for "fundamentally penal" sanctions -- such as "dismissals and default judgments, as well as contempt orders, awards of attorneys' fees, and the imposition of fines" -- the clear and convincing standard is used. *Id***.** (quoting *Compton*, 938 F. Supp. 2d at 104–05). Judge Simonton used the preponderance of the evidence standard for the witness-tampering allegations insofar as the plaintiffs sought non-dispositive sanctions

and applied the more-exacting clear and convincing standard to the request for dispositive sanctions.

In this case, the EEOC has requested myriad types of issue-related sanctions, such as adverse inferences and orders permitting or excluding the parties from introducing certain types of evidence. They require proof by a preponderance of the evidence. None of the relief the EEOC requests is a penalty-type of sanction, so it does not need to establish anything concerning its sanctions motion by the more-strict clear and convincing standard. *See Tarasewicz v. Royal Caribbean Cruises Ltd.*, No. 14-CIV-60885, 2016 WL 3944176, at *4 (S.D. Fla. Feb. 9, 2016), report and recommendation adopted, 2016 WL 3944178 (S.D. Fla. Mar. 17, 2016) (following *Brican's* standard of proof analysis); *Fed. Deposit Ins. Corp. v. Smith*, No. 13-14151-CIV, 2014 WL 12206380, at *2 (S.D. Fla. Mar. 12, 2014) (same).

### D.     *Potential Consequences if No Bad Faith is Established*

Most of the sanctions the EEOC requests are adverse inferences. [ECF No. 246, pp. 20–21, 24]. As to paper applications and interview booklets, the EEOC requests an inference that applications at four locations "would have shown more significant under-hiring of older applicants than Census proxies and electronic data;" that applications at five locations "would have provided anecdotal age discrimination testimony;" and that interview booklets "could have contemporaneously recorded the interviewer's observations, age bias and other indicia of what took place at the interviews, which

59

could be used to rebut the assertion that older applicants performed poorly at interviews as compared with younger applicants[.]" [ECF No. 246, pp. 20–21].

As to emails, the EEOC asks "to argue what the lost emails likely would have contained;" seeks an inference that preservation of emails "would reflect additional emails expressing a preference for younger applicants;" and requests an order to "not allow [Seasons 52] to introduce evidence about the content of lost emails" (i.e., to prevent it from rebutting the EEOC's arguments about what emails might have shown). [ECF No. 246, p. 24].

Each of these requests seeks a sanction in the form of a presumption as to what unavailable documents would have shown. These types of sanctions are adverse inferences and, therefore, require a predicate showing (by a preponderance of the evidence) of bad faith.

In prior decisions (and as noted above), the Court has categorized the "different types of adverse inferences," which include the types of sanctions that the EEOC has requested in this case. *Commercial Long Trading Corp. v. Scottsdale Ins. Co.*, No. 12-22787-CIV, 2013 WL 1100063, at *3 (S.D. Fla. Mar. 15, 2013); *Point Blank Sols., Inc. v. Toyobo Am., Inc.*, No. 09-61166-CIV, 2011 WL 1456029, at *9 (S.D. Fla. Apr. 5, 2011). "The harshest type" is a jury instruction "that certain facts are deemed admitted and must be accepted as true." *Commercial*, 2013 WL 1100063, at *3. In the middle is "imposition of a mandatory, albeit rebuttable, presumption." *Id.* Finally, the "least-harsh type" is one

that "permits a jury to presume that the lost evidence is relevant and favorable to the innocent party," but where "the jury also considers the spoliating party's rebuttal evidence and then decides whether to draw an adverse inference." *Id.*

But none of these adverse inferences requested by the EEOC is permitted without a finding of bad faith. *See Mann*, 588 F.3d at 1310 ("In the Eleventh Circuit, 'an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith.'") (quoting *Bashir*, 119 F.3d at 931); *see also Point Blank Sols.*, 2011 WL 1456029, at *1 (refusing to impose an adverse inference "unless there is evidence of bad faith").

The Court, however, must still consider two *other* potential broad categories of consequences (other than an adverse inference) if bad faith is not established: (1) excluding or limiting testimony and (2) permitting the jury to consider evidence of spoliation.

Moreover, these consequences are not necessarily tied to the Court's inherent power to impose spoliation sanctions; they can be imposed as discovery sanctions without a finding of bad faith. *See EEOC v. Troy State Univ.*, 693 F.2d 1353, 1358 (11th Cir. 1982) (reversing dismissal of the EEOC's lawsuit where the EEOC's failure to comply with Court discovery orders was not in bad faith, and noting that the district court should have considered other available sanctions, such as limiting the EEOC's production of evidence); *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 12 F.3d 1045,

1049 (11th Cir. 1994) (holding that under Rule 37, "[a] court may impose lesser sanctions without a showing of willfulness or bad faith on the part of the disobedient party.").

On the other hand, the subsection of the applicable rule of civil procedure concerning the failure to preserve ESI permits harsh-type sanctions like an adverse inference "only upon finding that the party acted with the **intent to deprive** another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2) (emphasis added).

The advisory committee notes to the 2015 amendment to Rule 37 (which added the section for sanctions arising from failures to preserve ESI) explains that the "very severe measures" mentioned in subsection (e)(2) rejects cases which "authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence." Fed. R. Civ. P. 37 (advisory committee notes). The notes provide a policy theory for its position: negligent or even grossly negligent behavior "does not logically support" the "inference" that the missing or destroyed evidence "was unfavorable to the party responsible for loss or destruction of the evidence." *Id.*

In fact, the notes provide additional clarification for the provision requiring intent: "Information lost through negligence may have been favorable to either party, **including the party that lost it**, and inferring that it was unfavorable to that party may tip the balance at trial in ways the lost information never would have." *Id.* (emphasis added); *see, e.g., Living Color Enterprises, Inc. v. New Era Aquaculture, Ltd.*, No. 14-CV-

62216, 2016 WL 1105297, at *6 n.6 (S.D. Fla. Mar. 22, 2016) (declining to impose Rule 37(e)(2) sanctions because there was no evidence that the defendant intentionally deleted text messages in order to deprive the plaintiff of their use in the lawsuit, and observing that "intent to deprive" standard "may very well be harmonious with the 'bad faith' standard").

As further explained by the advisory committee notes:

> Subdivision (e)(2) **does not include a requirement that the court find prejudice to the party deprived of the information**. This is because the finding of intent required by the subdivision can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an **inference** that the opposing party was **prejudiced** by the loss of information that would have favored its position. Subdivision (e)(2) does not require any further finding of prejudice.

Fed. R. Civ. P. 37 (advisory committee notes); *see E.E.O.C. v. Jacksonville Shipyards, Inc.*, 690 F. Supp. 995, 998–99 (M.D. Fla. 1988) (declining to impose extreme sanctions under Rule 37 but finding that "lesser sanctions may effectively remedy the prejudice suffered by EEOC," such as "limit[ing] defendant's production of evidence in opposition to EEOC's presentation" or "equitably adjust[ing] the level of proof necessary to demonstrate discrimination[.]").

Setting aside Rule 37's applicability to ESI and focusing again on the EEOC's contention that Seasons 52 destroyed paper applications and written interview guidelines and booklets, courts in this jurisdiction have imposed lesser sanctions than dismissal or adverse inferences absent a finding of bad faith. *See Graff v. Baja Marine*

*Corp.*, 310 Fed. Appx. 298, 302 (11th Cir. Feb. 2, 2009) (upholding the exclusion of expert testimony because, "[e]ven if the plaintiffs did not act with malice when they spoliated evidence, the plaintiffs were the more culpable party and caused the manufacturers substantial prejudice.");[18] *Gess v. United States*, 952 F. Supp. 1529, 1560 n.50 (M.D. Ala. 1996) (noting that "[i]t does not appear initially that the defendant's conduct rises to the level of culpable conduct required in the Eleventh Circuit to warrant an entry of default judgment," but that "the plaintiffs may be entitled to some form of sanctions for the defendant's destruction of critical evidence.").

Permitting the EEOC to introduce evidence of spoliation at trial (and permitting Seasons 52 to introduce evidence and make arguments to explain the loss of evidence without obtaining an adverse inference or a permissible adverse inference) is the mildest sanction sought by the EEOC, and it is permitted without a bad faith finding. *See U.S. E.E.O.C. v. Suntrust Bank*, No. 8:12-CV-1325-T-33, 2014 WL 1364982, at *11 (M.D. Fla. Apr. 7, 2014) (allowing the EEOC to introduce evidence at trial of defendant's policies regarding preservation of its surveillance videos and its failure to preserve surveillance video evidence); *Floeter*, 2007 WL 486633, at *7 ("Courts have found that loss of evidence may be relevant and admissible for the jury's consideration, and that adverse inferences arising from such destruction can be argued by counsel in

---

[18] Although *Graff* is an unpublished opinion based in part on Georgia law. *Graff*, 310 Fed. Appx. at 302, the Eleventh Circuit excluded expert testimony absent a specific finding of bad faith.

closing.");[19] *Socas v. The Nw. Mut. Life Ins. Co.*, No. 07-20336-CIV, 2010 WL 3894142, at *9 (S.D. Fla. Sept. 30, 2010) (denying the defendant's request for dismissal or adverse inference but noting that "this ruling is not intended to preclude [the defendant] from introducing into evidence the facts concerning this failure to preserve relevant documents."); *Managed Care Sols.*, 736 F. Supp. 2d at 1334 (denying sanctions motion but explaining that "this ruling does not foreclose the possibility that the plaintiff will be able to introduce evidence of the defendant's failure to retain relevant documents at trial.").

Rule 37(e) also permits a court to impose measures other than the severe ones listed in (e)(2) without finding that the party responsible for the failure to preserve had the requisite intent. Thus, the notes explain that "subdivision (e)(2) would not prohibit a court from allowing the parties to present evidence to the jury concerning the loss and likely relevance of information and instructing the jury that it may consider that evidence, along with all the other evidence in the case, in making its decision." Fed. R. Civ. P. 37 (advisory committee notes). A court could do this if the measure was "no greater than necessary to cure prejudice." *Id.* In order to use this measure, however, a court or jury would need to also find the presence of three factors: (1) the ESI was lost "because a party failed to take reasonable steps to preserve it," (2) the lost ESI "cannot

---

[19]     The Magistrate Judge who entered the order noted that the presiding District Court Judge would decide whether the evidence and arguments would be permitted at trial. *Id.*

be restored or replaced through additional discovery," and (3) there is "prejudice" to the party "from loss of the information." Fed. R. Civ. P. 37(e)(1).

## III.    Findings and Conclusions

The Undersigned makes the following findings, which create the foundation for the substantive ruling:

1.    The EEOC has not established by a preponderance of the evidence that Seasons 52 received the so-called August 31, 2011 expansion letter. I have no doubt that Investigator Gonzalez actually *believes* that the letter was sent and that Seasons 52 received it. But there are too many vague and unusual circumstances surrounding the letter to support that theory.

First, Seasons 52's witnesses unequivocally testified that they never received it and that their records and databases do not contain it. Given that they concede receipt of other letters, this omission is significant. Second, the letter was not sent by telefax, overnight mail, certified mail/return receipt requested, or other method which would confirm receipt by Seasons 52. Third, although Investigator Gonzalez keeps a log of significant developments, there is no August 31, 2011 entry for preparation of the expansion letter. Fourth, the entry which does refer to the letter can be interpreted to refer only to the September 1, 2011 letter, as opposed to two letters (one dated August 31, 2011). Fifth, the reference to an expansion letter in the log does not contain a date. Sixth, although the expansion letter was dated August 31, Investigator Gonzalez says

that it was actually mailed the following day -- but she does not recall if she put both letters in one envelope. Seventh, the zip code on the August 31, 2011 letter was incorrect. Although the September 1, 2011 letter was in fact received by Seasons 52 even though it, too, contained an incorrect zip code, it is entirely feasible that one letter arrived and one letter was never delivered (if two envelopes were used).

2.    Seasons 52 knew by September 2011 that the EEOC's investigation focused on 10 restaurants, not merely the Coral Gables restaurant. The September 1, 2011 letter made explicit reference to an "expansion" of the case, and Seasons 52 was regularly forwarding information about 10 restaurants and then added another restaurant (i.e., Naples) to the ongoing production. It also arranged for managers at restaurants other than Coral Gables to be interviewed.

3.    Seasons 52 was therefore under a duty to preserve relevant materials for those 11 restaurants. That duty began in September 2011 for the 10 restaurants on the list and began for the Naples restaurant on the first day that Seasons 52 provided information about that location.

4.    Given that the EEOC's September 1, 2011 letter mentioned an expansion of the case, the Undersigned deems Seasons 52's lack of logical follow-through to be unacceptable. Seasons 52's attorneys should have asked Investigator Gonzalez the logical follow-up question: *how* **is the case expanding**? The notice that the case had expanded was in the very first sentence of the letter, so it is difficult to understand how

or why Seasons 52 did not realize that something substantively significant had happened and that they needed to quickly determine what it was and what needed to be done.

5.      Seasons 52's position that it believed the EEOC's investigation focused only on one restaurant is perhaps theoretically *plausible* but I do not find it logical or persuasive. A jury, however, could conceivably find it convincing (or convincing enough).

6.      Seasons 52's own document retention policy required it to preserve materials for the EEOC's investigation -- which encompassed 11 restaurants. Seasons 52 should have implemented litigation holds for all restaurants, not merely the Coral Gables one. Although Seasons 52 says that it preserved materials anyway, the EEOC has established that materials concerning three of the eleven restaurants involved in the investigation were not produced.

7.      The applicable EEOC regulations required Seasons 52 to preserve records -- but only for the one restaurant at issue in the two actual charges. The notice of charge lists record-keeping duties until disposition of "the charge" -- and the only charges here are the two filed by two applicants to the Coral Gables restaurant.

8.      But the Undersigned also rejects the EEOC's position that Seasons 52 knew since September 2011 that the investigation was *national* and covered all restaurants at issue in the lawsuit. To the contrary, virtually all communications

between Seasons 52 and the EEOC concerned the 11 restaurants. Moreover, the definition of the relevant time period provided in the September 1, 2011 letter is at odds with the view that all 35 Seasons 52 restaurants were part of the investigation. Therefore, the duty to preserve arose only in connection with 11 restaurants.

9.      Despite his review of less-than-optimal data, the EEOC's expert witness was still able to reach conclusions even without certain paper applications and interview booklets. Significantly, although he voiced a preference for additional information, the EEOC's expert ultimately explained that his opinions are still valid.

10.      The Undersigned does not view Dubinsky's reference to a "nationwide hiring policy" to mean that Seasons 52 in fact understood that the EEOC's investigation was "national" in the full sense of the word. Instead, it is logically interpreted to mean that Seasons 52 knew that the investigation concerned 11 restaurants that happened to be located in 11 cities around the country. To the extent those cities are in myriad locations in the country, then Seasons 52 knew the investigation covered restaurants in 11 specific restaurants throughout the nation. That does not, however, equate to a belief that all Seasons 52 restaurants "across the nation" were part of the investigation or that the investigation was "national."

Additional findings and conclusions are explained below, under appropriate sub-topics.

**A.      *Prejudice and Curability of Prejudice***

11.      Seasons 52's destruction of paper applications has caused *some* prejudice to the EEOC, which will be seeking to prove its case through statistical and anecdotal evidence. On the other hand, the unavailability of the paper applications does not generate horrific consequences. The EEOC's expert was still able to reach conclusions. Moreover, the applications themselves do not list dates of birth, so their absence is not as significant as the loss of evidence directly establishing applicants' ages.

12.      To an extent, the same comments can be made about the interview booklets and interview guides. Although those materials might conceivably have been particularly significant had they been comprehensively and routinely used, it appears as though Seasons 52's managers and those involved in the interview process often did not fill out those booklets or did not fill them out completely. Moreover, they do not contain birthdate information.

13.      For emails, Seasons 52 took no steps to preserve them at 34 of the 35 locations at issue in this lawsuit until after the lawsuit was filed. As explained above, however, the Undersigned finds that Seasons 52 was under a preservation duty for only 11 restaurants, which means that no litigation hold was issued for any of these 11 restaurants other than Coral Gables. Seasons 52 has conceded that the lost emails cannot be restored or replaced because they were deleted and cannot be recovered.

14.      But it is difficult to conclusively determine that the missing materials --

paper applications, interview booklets, interview guides, and emails -- would necessarily have helped the EEOC or undermined Seasons 52's defense. It is conceivable that the information could have been helpful to Seasons 52.

15.     Moreover, Seasons 52 certainly has a logical argument that the missing materials were not critical or crucial to the EEOC's case, which is why the Undersigned is not now granting the EEOC harsh-type sanctions like a permissible adverse inference. Because the EEOC's expert was still able to complete his analysis and offer valid opinions in support of the EEOC's position, the EEOC has not met one of the critical prerequisites for a permissible adverse inference -- that the missing or destroyed materials were **crucial** to its case. *Managed Care Sols.*, 736 F. Supp. 2d at 1327–28 (finding that evidence was not crucial to plaintiff's claims because it could establish its case through other evidence); *Floeter*, 2007 WL 486633, at *6 (finding that although missing emails may be *relevant* to the plaintiff's case, they were not critical); *see also Siciliano v. Target Corp.*, No. 9:14-CV-80459, 2015 WL 11348279, at *4 (S.D. Fla. Apr. 24, 2015) (denying motion for sanctions for spoliation of evidence concerning allegedly missing video surveillance footage, holding that the plaintiff did not establish that the footage is crucial to her ability to prove her prima facie negligence case and noting that "there is alternative evidence available"); *Acre v. Chambers*, No. 2:14CV211-CSC, 2015 WL 668054, at *2 (M.D. Ala. Feb. 17, 2015) (denying the plaintiff's sanctions motion based on spoliation in a police brutality case and noting that the "plaintiff's claim of severe

prejudice is unpersuasive" because other witnesses could testify about what happened, which means that the failure to secure a taser in a manner which maintained the internal clock can be offset through other evidence); *Wilson v. Wal-Mart Stores, Inc.*, No. 5:07CV394-OC-10GRJ, 2008 WL 4642596, at *3 (M.D. Fla. Oct. 17, 2008) (finding that missing memorandum was not "critical" to the plaintiff's ability to prove her employment discrimination case "because there is other evidence potentially available to [the p]laintiff to prove her claim.").

**B.**     *Bad Faith*

Because the Undersigned finds that the missing non-ESI materials are not crucial to the EEOC's case, there is no need for me to now determine whether Seasons 52 acted in bad faith in connection with the paper applications and interview booklets. I have already noted that Seasons 52's interpretation of its preservation duty is illogical and that its own records retention policy required preservation of records from at least 11 restaurants. Of course, this might mean only that Seasons 52 acted negligently or grossly recklessly, which is surely an unfortunate description but still one not reaching the requisite bad faith level. At trial, the EEOC will be permitted to introduce evidence concerning these conclusions and the surrounding circumstances. Seasons 52, of course, is free to introduce evidence

and arguments to support its theory that its Seasons 52 restaurants acted properly.[20]

Seasons 52 should not be patting itself on the back too vigorously, though. Although the Undersigned is not ruling in the EEOC's favor on its permissible inference request concerning non-ESI, there is surely record evidence to at least support its argument that Seasons 52 acted in bad faith. In other words, the EEOC's theory that Seasons 52 acted in bad faith is far from fanciful. The EEOC may not have been able to prove its bad-faith hypothesis by a preponderance of the evidence under the four-factor circumstantial evidence standard, but it may well have come close. Or maybe it could have. The Undersigned has not grappled with this sticky issue to the point where I have reached a final conclusion. Nonetheless, Seasons 52 will at trial need to confront thorny and awkward evidence about the EEOC's theory concerning its failure to timely and comprehensively respond to notice that the case had expanded.

On the other hand, the EEOC could have been clearer in articulating its view that

---

[20]    Arguments about missing or destroyed evidence would not be available for missing paper applications for the Kansas City and Jacksonville locations, however. Both of those restaurants opened outside the time period specified in the EEOC's September 1, 2011 RFI letter and were therefore not included in the EEOC's pre-lawsuit investigation. Moreover, the Kansas City restaurant lost most of its paper records in a fire. At the hearing, the EEOC conceded that it was not arguing that Seasons 52 somehow arranged for a fire at the restaurant in order to destroy records in a way designed to make their disappearance seem incorrectly innocuous. In its sanctions motion, the EEOC argues that it "would have had more Stage 1 claimants if [Seasons 52] had not shredded, **burnt,** and mysteriously destroyed data." [ECF No. 246, p. 17 (emphasis added)]. This reference to "burnt" material appears to be an overly dramatic rhetorical flourish given the EEOC's concession that it has no evidence to suggest that Seasons 52 purposefully started a fire at one restaurant.

the investigation was national (encompassing all 35 restaurants) if that was indeed its perspective. Moreover, even if Seasons 52 had in fact received the August 31, 2011 letter, that communication was comparatively cryptic. For example, the EEOC could easily have expressly passed along a clear litigation hold directive, such as: "You must preserve all documents and electronically stored information concerning hiring practices at all Seasons 52 restaurants in the United States, including applications, interview notes, interview booklets and instructions, hiring decisions, and email and test messages."

Given this scenario, the Undersigned will permit the parties to present competing facts and theories to the jury about missing paper applications (and whether any were missing at all, as opposed to simply not being available because they never existed in the numbers anticipated by the EEOC), missing interview booklets and guides, and the loss of email. They will also be permitted to submit evidence and argument about the relevance (or lack of relevance) of these materials. But no adverse inferences will now be necessarily permitted, either at the summary judgment stage or at trial.

Concerning the ESI, however, Rule 37(e)(2) permits the jury to reach an adverse inference without a finding of prejudice to the EEOC **if** Seasons 52 is shown to have destroyed the ESI in bad faith (as defined by the Rule). Therefore, this Order permits the EEOC to argue to the jury that it may reach an adverse inference about missing ESI if

(but only if) it concludes that Seasons 52 acted in bad faith (i.e., "with the intent to deprive" the EEOC of the ESI's use in this lawsuit. The EEOC is permitted to seek to accomplish this goal (concerning ESI, not the paper applications and interview booklets) without also obtaining a finding of prejudice to the EEOC. This Order therefore resolves most of the arguments but leaves this one issue for the jury's determination.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on November 1, 2017.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Joan A. Lenard
All Counsel of Record